STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. ROBERT
DES MARETS, DEFENDANT-APPELLANT.

STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JEF-
FREY TODD APPLETON, DEFENDANT-APPELLANT.

Argued November 23, 1982—Decided January 26, 1983.

*Herbert I. Waldman,* Designated Counsel, argued the cause for appellant Robert Des Marets (*Joseph H. Rodriguez,* Public Defender, attorney).

*Donald T. Thelander,* Assistant Deputy Public Defender, argued the cause for appellant Jeffrey Todd Appleton (*Joseph H. Rodriguez,* Public Defender, attorney).

*Thomas W. Greelish,* First Assistant Attorney General, and *Allan J. Nodes,* Deputy Attorney General, argued the cause for respondent (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Frank M. Gennaro,* Deputy Attorney General, of counsel and on the letter brief (A–68) and *Allan J. Nodes* and *Katherine F. Graham,* Deputy Attorney General, of counsel and on the brief (A–93)).

The opinion of the Court was delivered by

WILENTZ, C.J.

These cases present two questions concerning permissible sentencing for Graves Act offenses. *N.J.S.A.* 2C:43–6(c); *L.*1981, *c.* 31. May the trial court impose an indeterminate term at a youth correctional institution? May the trial court impose the mandatory three year imprisonment sentence and then suspend it?

The Graves Act provides, generally, that one who uses or possesses a firearm while committing, attempting to commit, or fleeing after the commission of, certain serious offenses specified in that Act shall be mandatorily sentenced to prison for a term that includes at least three years of parole ineligibility.[1] If trial courts retain the power to suspend sentence of those guilty

---

[1] The Act at the time of the offense provided in part that:

of Graves Act offenses or to sentence to an indeterminate term at a youth correctional institution, the three year mandatory imprisonment of the Graves Act would not be imposed, and the deterrent impact on gun-related crimes sought by the Legislature would be lost. We hold that our courts have no such power.

We also hold that the sentence that includes the three year parole ineligibility term may not be to a youth correctional institution, but rather requires imprisonment, although those in charge of the State prison may, if they see fit, administratively transfer prisoners to such institutions (*N.J.S.A.* 30:4–85), and that the "possession" of a firearm need not be possession with intent to use in order to make the Graves Act applicable.

We therefore affirm the Appellate Division in *Des Marets* and the trial court in *Appleton,* which we certified directly before the Appellate Division heard the matter.

We do not pass on the wisdom of this legislation's mandatory three year imprisonment term or the wisdom of its imposition on

---

A person who has been convicted under 2C:39–4a. or of a crime under any of the following sections: 2C11–3, 2C:11–4, 2C:12–1b., 2C:13–1, 2C:14–2a., 2C:14–3a., 2C:15–1, 2C:18–2, 2C:29–5, who, while in the course of committing or attempting to commit the crime, including the immediate flight therefrom, used or was in possession of a firearm as defined in 2C:39–1f., shall be sentenced to a term of imprisonment by the court. The term of imprisonment shall include the imposition of a minimum term. The minimum term shall be fixed at, or between, one-third and one-half of the sentence imposed by the court or 3 years, whichever is greater, or 18 months in the case of a fourth degree crime, during which the defendant shall be ineligible for parole. [*N.J.S.A.* 2C:43–6(c)].

The covered offenses, in addition to possession of a firearm with intent to use same unlawfully, *N.J.S.A.* 2C:39–4a, are murder, manslaughter, aggravated assault, kidnapping, aggravated sexual assault, aggravated criminal sexual contact, robbery, burglary and escape.

Reference is sometimes made herein, based on the Act's language, to the mandatory three year imprisonment sentence. That sentence will presumably include a provision "commit[ting defendant] to the custody of the Commissioner of the Department of Corrections for the term of his sentence and until released in accordance with law." *N.J.S.A.* 2C:43–10a.

the offenses covered. That is a matter solely for the Legislature to decide. Once the Legislature has made that decision, and has made it within constitutional bounds, our sole function is to carry it out. Judges have no business imposing their views of "enlightened" sentencing on society, 92 *N.J.* at 91 (Handler, J., dissenting), including notions of discretionary, individualized treatment, when the Legislature has so clearly opted for mandatory prison terms for all offenders. It may be that the Legislature is more enlightened than the judges.[2] Our clear obligation is to give full effect to the legislative intent, whether we agree or not. We have endeavored to do so here.[3]

## Des Marets

### I.

On March 23, 1981, defendant Robert Des Marets committed two separate acts of burglary. During the first of these incidents, defendant stole two unloaded handguns.[4]

Pursuant to a plea bargain, defendant entered a plea of guilty to two charges of burglary in violation of *N.J.S.A.* 2C:18–2, two

---

[2]As noted recently by the Supreme Court, "Legislatures, not courts, prescribe the scope of punishment," *Missouri v. Hunter,* —— *U.S.* ——, ——, 103 *S.Ct.* 673, 679, 74 *L.Ed.*2d 535 (1983) (where the legislature intends to punish criminal conduct under more than one statute, the Double Jeopardy Clause is not violated by the imposition in a single trial of cumulative sentences for the same conduct).

[3]See our memorandum of April 27, 1981, to all trial court judges, printed following *N.J.S.A.* 2C:43–6 (1982), prohibiting conventional plea bargaining of Graves Act offenses.

[4]Des Marets, therefore, "was in possession of a firearm" during "the immediate flight" from the commission of a burglary. He was clearly guilty of a Graves Act offense. The dissent's added requirement, not found in the statute, that "possession" means "possession with intent to use against the person," would relieve Des Marets—and everyone else who steals guns not *then* intending to use them—of this Graves Act mandatory imprisonment term.

charges of theft in violation of *N.J.S.A.* 2C:20–3, and one charge of possession of a handgun without a license in violation of *N.J.S.A.* 2C:39–5(b). In return, the State agreed to recommend that defendant, then 18 years of age, be placed on probation after serving a custodial term of 90 days. Defendant had a juvenile record, but had never been incarcerated.

On the day of sentencing, the court refused to accept the plea bargain agreement because of the provisions of the Graves Act. As noted above, the Act mandates a three year imprisonment term in connection with a burglary conviction where the defendant "while in the course of committing or attempting to commit the crime, including the immediate flight therefrom, used or was in possession of a firearm . . . ." Although acknowledging Des Marets never evinced any intent to use the weapon and did not arrive armed at the burglary during which the guns were taken, the court nonetheless concluded his actions fell within the statute's coverage. Defendant chose not to withdraw his pleas of guilty.

The judge then stated that although it was his preference to sentence defendant to an indeterminate term provided for by the youthful offender statute, *N.J.S.A.* 2C:43–5, he felt his normal sentencing discretion foreclosed by the Graves Act. He sentenced Des Marets to the New Jersey State Prison for four years with a mandatory minimum of three years.

On May 5, 1982, the Appellate Division affirmed defendant's conviction. The court rejected defendant's contention that the Act was not intended to apply to a situation in which defendant steals a gun at the scene rather than arming himself in advance of the crime. It held further that the state did not have to prove intent to use the weapon; possession was sufficient. The court also ruled that the Legislature was within its rights in eliminating the judicial power to suspend sentences in Graves Act cases.

We granted certification, 91 *N.J.* 254 (1982).

## II.

■ Defendant Des Marets argues that no relationship existed between his possession of a firearm and the crime committed. Although physically in possession of a weapon, the gun was unloaded at all times and defendant never used it or demonstrated any intent to use it. Des Marets maintains "possession" for the purposes of the Graves Act should be interpreted as possession with intent to use and that he, accordingly, falls outside the law's coverage.

While it is theoretically debatable whether the Graves Act contemplates merely the physical act of possession of a firearm or possession with intent to use, the Act's purpose clearly resolves the issue.

The intent of the Act is manifest: at the very least, to ensure incarceration for those who arm themselves before going forth to commit crimes. The Act is a direct response to a substantial increase in violent crime in New Jersey. The history of the legislation makes it clear that its focus is deterrence and only deterrence; rehabilitation plays no part in this legislation.[5] The intended deterrence can be served only by giving effect to the obviously broad coverage of this law.

A holding that the Graves Act sanctions apply upon a showing of possession of a firearm, without any need to demonstrate intent to use, should not surprise defendants subject to its provisions.[6] The statute itself requires "possession" and no

---

[5] The Act's legislative intent is discussed in greater detail, *infra*.

[6] Although the term possession is not defined in this Act, it is defined in other areas of the Code. For example, *N.J.S.A.* 2C:2–1(c) states:

> Possession is an act, within the meaning of this section, if the possessor knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient period to have been able to terminate his possession.

In addition, in *State v. Brown,* 80 *N.J.* 587, 597 (1979), it was held criminal possession of an object signifies:

more. The use of that unqualified word, especially as part of the phrase "used or was in possession of a firearm" strongly suggests that the actor's state of mind was meant to be irrelevant. The inclusion of *N.J.S.A.* 2C:39–4a as a Graves offense is also persuasive. That section of the Code covers possession of a firearm with intent to use it unlawfully. No more is required for a Graves Act offense to occur, neither murder, manslaughter, aggravated assault nor any of the other offenses thereafter listed in the Act. That part of the Act, therefore (practically all of it), covering conviction of certain crimes where defendant "was in possession of a firearm," would be largely superfluous if intent to use was also required to be proven, for, by virtue of the inclusion *N.J.S.A.* 2C:39–4a, Graves Act consequences would always follow upon such proof regardless of the commission or non-commission of such crimes.

The foregoing conclusion becomes graphically clear when the Act is read in its present form, including the amendment of 1982 (not in effect at the time of Des Marets' offense):

> A person who has been convicted under 2C:39–4a. *of possession of a firearm with intent to use it against the person of another,* or of a crime under any of the following sections: 2C:11–3, 2C:11–4, 2C:12–1b., 2C:13–1, 2C:14–2a., 2C:14–3a., 2C:15–1, 2C:18–2, 2C:29–5, who while in the course of committing or attempting to commit the crime, including the immediate flight therefrom, used or was in possession of a firearm .... [*N.J.S.A.* 2C:43–6c. (emphasis represents 1982 amendment, *L.*1982, *c.* 119)].

The *express* inclusion of a requirement of intent to use in the first instance persuasively suggests its absence in all others.

There are policy considerations that weigh in favor of extending the law to encompass Des Marets. Even if a criminal has no

---

"... intentional control and dominion, the ability to affect physically and care for the item during during a span of time", *State v. Davis,* 68 *N.J.* 69, 82 (1975), accompanied by knowledge of its character, *State v. Reed,* 34 *N.J.* 554, 557 (1961) ....

*But see State v. Stewart,* 186 *N.J.Super.* 517 (1982), (certif. pending), in which the Appellate Division held that the presence of a flaregun in the interior of a vehicle did not constitute possession as defined by the Graves Act.

intent to use his gun, the possession of a firearm presents definable dangers. It invites gun use by police or third parties, with attendant risks to all involved. More obviously, while an individual may have no intent to use a gun when he embarks upon a course of criminal conduct, this resolution could change under the pressure of ensuing events.

It is the mere presence of guns at the scene of crimes that this statute seeks to end.[7]

Defendant Des Marets was thus in possession of a firearm within the meaning of the Graves Act.[8]

### III.

It is further claimed that the court incorrectly concluded that it was not permitted to sentence defendant as a youthful offender to an indeterminate term at the Youth Correctional Institution Complex, despite the minimum term mandated by the Graves Act. Analysis of this claim requires further examination of the legislative intent embodied in both the Graves Act and in the statutes authorizing indeterminate sentencing for youthful offenders. *N.J.S.A.* 2C:43–5; *N.J.S.A.* 30:4–148.

Rehabilitation has long been central to this state's treatment of youthful offenders. Our laws concerning youthful offenders reflect the long-standing philosophy that "correction and rehabilitation, rather than retribution," are the preferred approaches to the problem. *State v. Horton*, 45 *N.J.Super.* 44, 46 (App.Div. 1957).

*N.J.S.A.* 2C:43–5 embodies this approach. It provides that:

---

[7]Des Marets also contends there is an inconsistency between his conviction on a charge of third degree burglary under *N.J.S.A.* 2C:18–2 (a crime that by definition involves an unarmed perpetrator) and his sentencing under the Graves Act. He urges the two statutes be read *in pari materia*. We disagree. The simple answer is that *N.J.S.A.* 2C:18–2 is specifically listed as a Graves Act offense.

[8]No claim is made that for the Act to apply, the firearm must be loaded.

> Any person who, at the time of sentencing, is less than 26 years of age and who has been convicted of a crime may be sentenced to an indeterminate term at the Youth Correctional Institution Complex in accordance with R.S. 30:4–146 et seq. in the case of men, and to the Correctional Institution for Women, in accordance with R.S. 30:4–153 et seq., in the case of women, instead of the sentences otherwise authorized by the code.

*N.J.S.A.* 30:4–148 provides in part that courts in sentencing pursuant to *N.J.S.A.* 2C:43–5 "shall not fix or limit the duration of sentence . . . ."

Indeterminate sentencing to a youth correctional facility, rather than to State prison, is one of the primary means by which rehabilitation is accomplished. The theory behind such sentencing is to allow discretion to the custodial authorities to terminate a sentence if an offender is successfully rehabilitated, thus greatly increasing the incentive for rehabilitation. *See State v. Hopson,* 114 *N.J.Super.* 146 (App.Div.) (Halpern, J.A.D., dissenting), rev'd on dissent, 60 *N.J.* 1 (1971). Accordingly, these statutes allow only indeterminate sentences, which may not include periods of parole ineligibility. *State v. Groce,* 183 *N.J.Super.* 168 (App.Div.1982).

The result is that youthful offenders who receive indeterminate sentences pursuant to *N.J.S.A.* 2C:43–5 may have their sentences terminated at any time. *N.J.S.A.* 30:4–123.51(f). Theoretically, this could occur very shortly after sentencing. Certainly many youthful offenders who were convicted of Graves Act offenses, for which a three-year minimum term is mandated, would be released long before this time had elapsed if they received indeterminate sentences.

The Graves Act represents a different philosophy. Instead of an approach to crime that looks to rehabilitation through the promise of release, the Graves Act approach is deterrence through the promise of imprisonment.[9] Furthermore, its spirit

---

[9]Deterrence however is at least as important to the welfare of young adults as rehabilitation. In 1979 (the most recent statistics available), 12.6 percent of the deaths of persons between ages 15–24 were caused by homicides.

is totally contrary to the belief that *all* of the circumstances of both the offender and the offense must be considered if justice is to be done, and that one of the most important aspects of our system of criminal justice is the discretionary nature of punishment.

A court's preference between these two approaches to the problem of crime is irrelevant here, for our task, as always, is to seek the legislative intent. It is not difficult to divine.

We begin by looking at violent crime statistics. Recent statistics indicate violent crime in New Jersey jumped by 21 percent between 1979 and 1980 and 5 percent between 1980 and 1981. Uniform Crime Reports, *Crime in New Jersey 1980* at 18; Uniform Crime Reports, *Crime in New Jersey 1981* at 16. The role of firearms in violent crime is likewise alarming. In 1979, for example, firearms were involved in 63.3 percent of all murders, 39.7 percent of all robberies, and 23 percent of all aggravated assaults that occurred nationwide. *Federal Bureau of Investigation Uniform Crime Reports of 1979* at 10, 18, 20.

These disturbing statistics confirm the obvious intent of the Graves Act to deter the use and possession of firearms by criminals for the purpose of reducing the number of persons killed or injured by such weapons. As the Assembly Judiciary Committee noted in discussing the legislative goal of the fore-runner to the Graves Act:

> Crimes committed with guns are on the rise and deaths from these crimes are also increasing. Guns are particularly dangerous weapons, all too easy to use and to kill with if used. The purpose of this bill is to make criminals think twice before going forth to commit crimes armed with guns. [Assembly Judiciary, Law, Public Safety and Defense Committee, Statement to S.1071, July 24, 1980.][10]

---

*Health of the United States,* National Center for Health Statistics, Department of Health and Human Services (1982).

[10]Although the specific provisions of the Graves Act differ from S.1071, *infra* at 78–79, no one disputes the fact that the underlying purpose of the legislation has remained the same.

It is clear that the Legislature had in mind very specific means to carry out its intent. It sought to deter the use of firearms by establishing mandatory minimum terms of imprisonment to ensure certainty of punishment. The Senate version of the Graves Act was accompanied by the following statement: "This bill provides for *mandatory minimum sentences* for individuals convicted of certain specified violent crimes where they possess or use a firearm during the commission of the crime." Senate Law, Public Safety and Defense Committee Statement to S.3057 (emphasis added).

Enforcing the certainty of imposition of this punishment upon conviction of a Graves Act offense was central to the intent of the drafters. Thus, the Senate Report on the Graves Act explicitly stated that those convicted would be ineligible for parole, and that suspensions and non-custodial dispositions would not be permitted. The efficacy and perhaps even the wisdom of this approach may not be clear to some, but the message intended by the Legislature could hardly be clearer: if you are convicted of a crime against a person while using or possessing a firearm, you will go to prison for at least three years. Period. The Graves Act aims at deterrence through the eventually widespread knowledge that one who is convicted of using or possessing a firearm while committing any one of a number of crimes cannot, and will not, escape a mandatory minimum imprisonment of at least three years.

That deterrence is as permissible a legislative goal as rehabilitation when dealing with the problems of youthful offenders is unquestioned. *See State in the Interest of C.A.H. and B.A.R.*, 89 *N.J.* 326, 334–36 (1982). The legislative legitimacy of attempting to deter youthful offenders is underscored by the stark facts of youthful crime. In New Jersey in 1981, persons under 25 years of age were arrested for 225 of 447 arrests for murder, 32 of 62 manslaughters, 698 of 1,237 rapes, 4,740 of 6,169 robberies, 5,662 of 10,252 aggravated assaults, and 14,761 of 18,244 burglaries. Uniform Crime Reports, *Crime in New Jersey 1981* at 41–42. Firearms play a role in a significant propor-

tion of these crimes. The concern of the Legislature in deterring crimes involving firearms legitimately extends to both youthful and adult offenders; indeed, youth involvement is apparently shockingly high.

We are thus faced with an inescapable conflict between the Graves Act and the youthful offender statutes. The essence of the Graves Act is that anyone convicted of possessing or using a firearm during the course of enumerated crimes will face a certainty of at least three years imprisonment, that certainty achieved by a clear statement that proscribes parole eligibility, suspension of sentence and non-custodial dispositions.[11] In contrast, indeterminate sentencing is perhaps the central feature of the youthful offender statutes under consideration, and the plain consequence of such sentences is that they may be legitimately terminated at any point. This is the antithesis of certainty.

This is not the first time that our courts have concluded that there is a conflict between these youthful offender statutes and mandatory minimum sentencing provisions. *State v. Brozi,* 125 *N.J.Super.* 485 (App.Div.1973), certif. den., 64 *N.J.* 501 (1974); *State v. Hopson, supra; State v. Lavender,* 113 *N.J.Super.* 576 (App.Div.1971); *State v. Pallitto,* 107 *N.J.Super.* 96 (App.Div. 1969), certif. den., 55 *N.J.* 309 (1970); *State v. Ammirata,* 104 *N.J.Super.* 304 (App.Div.1969).

On two occasions, in *Hopson* and in *Brozi,* indeterminate sentencing of youthful offenders has been held permissible, notwithstanding mandatory minimum sentencing provisions. It does not appear, however, that youthful offenders were then regarded by the Legislature as one of the primary sources of the criminal problem addressed by the mandatory sentencing laws involved in these cases. That difference is critical, but there are others as well.

---

[11]As noted later, *infra* at 77–79, the Act's purpose and history compel the conclusion that suspension of sentence, although not explicitly referred to in its provisions, was intended to be prohibited.

The legislative policies then in effect concerning mandatory minimum sentences, as revealed by the applicable parole provisions, differed from those implicit in the Code. Under the mandatory imprisonment legislation at issue in *Hopson* (1971) and *Brozi* (1974), parole eligibility was not affected. Eligibility for first offenders began when an inmate served the minimum sentence or one-third of the maximum, less in each instance commutation time for good behavior and for diligent application to work assignments. *N.J.S.A.* 30:4-123.10 (repealed by the Parole Act of 1979, c. 441, § 27). At that time, then, many criminals who received minimum sentences never served their full minimum term. When the Legislature mandated minimum sentences for crimes then, it did so fully aware that not only was there no guarantee of incarceration for the full length of the minimum sentence, but there was also a significant probability that many inmates would be paroled well before they had served their minimum term. Under these circumstances, it was reasonable to permit the courts to sentence youthful offenders to indeterminate terms, even though such disposition permitted release from the reformatory prior to the time that would have been required by the mandated minimum sentence. Neither *Hopson* nor *Brozi* did violence to the legislative policies then in effect concerning mandatory minimum terms.

The present parole statutes demonstrate a significantly different legislative intent. *N.J.S.A.* 30:4-123.51(a), which in 1979 replaced the prior provision, *N.J.S.A.* 30:4-123.10, explicitly proscribes *anything* that would allow parole eligibility to begin before the entire term of any mandatory minimum sentence has been served. In contrast to the prior provision, when a parole ineligibility term is imposed and has not been fully served in prison, eligibility will not commence even if one-third of the sentence has been served and regardless of the amount of commutation and work credits. The effect is that each one of the crimes listed in the Graves Act has a specific mandatory minimum of at least three years in prison.

Standing alone, we would find these differences highly compelling evidence of a markedly different legislative policy regarding mandatory minimum sentences and would find them sufficient to distinguish this case from those cases that pre-date the Parole Act of 1979. When considered in conjunction with the unmistakable policy expressed by the Legislature in the Graves Act—that conviction for the listed offense results without fail in at least three years imprisonment, which imprisonment is not to be reduced by parole eligibility, sentence suspension, or anything—we find that the legislative intent permits but one conclusion. The courts have been left no discretion to sentence youthful offenders to indeterminate terms of imprisonment. All Graves Act offenders, even those under 26 years of age, must receive the mandatory minimum terms prescribed by the Act.[12]

We recognize that this decision repeals *N.J.S.A.* 2C:43–5 and *N.J.S.A.* 30:4–148 to the extent that these conflict with the Graves Act, and that such implied repeals are not favored. *Brewer v. Porch,* 53 *N.J.* 167 (1969). However, the presumption against implied repeals is overcome by a showing of irreconcilable inconsistency, which is the case here. 1A Sutherland, *Statutory Construction* § 23.10 (4th ed. 1972). In such situations, the general rule is that the later expression of legislative intent is intended to supersede prior law. *Brewer v. Porch, supra; Department of Labor v. Cruz,* 45 *N.J.* 372 (1965); *Two Guys from Harrison v. Furman,* 32 *N.J.* 199 (1960); *Montclair v. Stanoyevich,* 6 *N.J.* 479 (1951); *Sutherland, supra,* § 23.09. Given the clear legislative intent evidenced in the Graves Act, we find it must be construed as controlling in the case of youthful offenders.

---

[12]To the extent it conflicts with this opinion, *State v. Ribbecke,* 185 *N.J.Super.* 65 (Law Div.1982), is overruled. It is perhaps appropriate to take note here of S.1691, presently pending in the Assembly. S.1691 expressly provides that the indeterminate sentencing option in *N.J.S.A.* 2C:43–5 does not apply to Graves Act offenders.

To hold otherwise would drastically dilute the certainty of incarceration that is at the heart of the intent of the Graves Act. This is illustrated graphically by the fact that 59 percent of all Graves Act offenders during the first half of 1982 were under the age of 26 at the time of sentencing. Administrative Office of the Courts, "Sentencing Experience Under the Graves Act during the First Half of 1982." The availability of indeterminate sentencing, with the possibility of immediate or early release for over one-half of all Graves Act offenders, is irreconcilable with legislation intended to serve notice on *everyone,* not just half but everyone, that if they commit certain crimes with a gun in their possession they will with certainty go to prison for at least three years.

## IV.

Having determined that the Graves Act seeks to deter the possession or use of firearms through the imposition of mandatory minimum terms, we must consider defendant's claim that the Legislature did not intend to restrict courts in their traditional power to suspend the imposition of sentence.[13]  *N.J. S.A.* 2C:43–6(c) provides that Graves Act offenders "shall be sentenced to a term of imprisonment by the court," but does not explicitly mention suspension of sentences. Defendant Des Marets contends that the Graves Act does not eliminate the court's authority to suspend sentences, arguing that when a court imposes a sentence that is then suspended, the defendant has been "sentenced to a term of imprisonment" within the meaning of the Graves Act. We disagree and hold that the Legislature intended that courts be barred from suspending the imposition of sentence for the period of the minimum term.

Certainly the Act could have disposed of this issue more clearly. For example, the Legislature could have said that

---

[13] *N.J.S.A.* 2C:43–2(b) provides that courts generally may suspend the imposition of sentence, but that this power is subject to applicable provisions of the Code.

Graves Act offenders "shall be imprisoned for three years," rather than "shall be sentenced" to a three year term, or, more simply, that "sentence shall not be suspended." It would seem hardly necessary, however, having told a judge that he *must* sentence a defendant to three years imprisonment, to add that he may not immediately set him free. Lack of precision in drafting does not mandate lack of common sense in construction.

The original bill introduced on February 21, 1980, S.1071, explicitly stated that "any sentence imposed pursuant to this section shall be a fixed minimum sentence during which the defendant shall not be eligible for parole. *The court may not suspend or make any other non-custodial disposition of any person sentenced pursuant to this section.*" (Emphasis added). The Assembly Judiciary Committee Statement, dated July 24, 1980, which accompanied this version of the bill, noted that "neither parole, nor suspension or other noncustodial dispositions would be permitted during the period of the sentence imposed."

When this bill was later modified, the Legislature dropped the provision that expressly barred courts from suspending sentences.[14] This provision was also omitted from S.3057, the bill that ultimately became *N.J.S.A.* 2C:43–6.[15]

Under other circumstances, the excision of a provision barring courts from suspending sentences might well suggest that the Legislature had reevaluated its position and decided that the

---

[14]In its place, the Legislature added language identical to *N.J.S.A.* 2C:43–6(c), stating that persons who used or possessed a gun while committing certain crimes "shall be sentenced to a term of imprisonment by the court. The term of imprisonment shall include the imposition of a minimum term ... during which the defendant shall be ineligible for parole." *Second Official Copy Reprint,* S.1071.

[15]S.1071 was vetoed by Governor Byrne, in part because he thought minimum terms were required for too many kinds of offenses and in part because of the intrusion upon judicial discretion. *Governor Byrne's Veto Message to the Senate.* The Legislature then passed S.3057, which reduced the number of offenses covered by the Act. This bill was signed into law by the Governor.

Graves Act should not interfere with the judiciary's power to suspend sentences. In this case, however, the modification of the original bill did not reflect a legislative change of heart. As proof, one need only look to the Senate Statement accompanying S.3057: "Persons sentenced pursuant to [the Graves Act] would be ineligible for parole. Neither suspensions nor noncustodial dispositions would be permitted in such cases." Senate Law, Public Safety and Defense Committee Statement to S.3057.

Allowing courts to suspend sentences would frustrate the Legislature's attempt to achieve deterrence through certainty of punishment. The mandatory minimum sentences called for by the Senate Statement to the Graves Act cannot be achieved if judges are free to suspend sentences. When a legislature announces that criminals who use guns will serve at least three years in prison, it does not intend judges to set them free before they spend even one night there.

We thus hold that the intent of the Graves Act, if not its specific language, requires that sentences not be suspended and that offenders serve the statutorily prescribed minimum terms.[16]

---

[16]We dispose briefly of defendant Des Marets' claim that *L.*1982, *c.* 119, § 2, *N.J.S.A.* 2C:43–6.1 (adopted after the date of the offense here), indicates that judges retain the power to suspend sentences under the Act. That amendment deals with defendants who are serving minimum mandatory terms under the Graves Act for possession of a firearm with intent to use it against the property of another. The amendment was passed to avoid what the Legislature apparently concluded was undue severity in applying the Graves Act under those circumstances. It provides that such a defendant, if he "has not had his sentence suspended or been paroled or discharged," may move to have his sentence reviewed by the sentencing court. (The provision has no application to Des Marets because his was a crime against the person, not property.) The quoted portion of the statute is internally inconsistent with its operative provisions. One who is currently *serving* a mandatory minimum term could not, despite what the statute seems to suggest, have already had his sentence suspended or have been paroled or discharged. We glean from this language simply no indication that judges may suspend

## V.

■   Although the intent of the Legislature is clear, the extent to which this intent intrudes upon judicial prerogatives remains to be discussed.

The defendant contends that suspension of sentences is an inherent judicial power protected by our Constitution from legislative interference. *See* Article III, par. 1 (separation of powers), and Article VI, § I, par. 1 (judicial power).

From at least as early as 1846, courts in New Jersey have exercised the power to suspend sentences in criminal actions in furtherance of the interests of justice despite the absence of statutory authority. *Adamo v. McCorkle,* 13 *N.J.* 561, 564 (1953). This judicial power, codified in *N.J.S.A.* 2C:43–2b was a common law attribute predating its statutory form both in this state and elsewhere. *In re Baer,* 140 *N.J.Eq.* 571, 573 (E. & A. 1947); *Gehrmann v. Osborne,* 79 *N.J.Eq.* 430, 443 (Ch. 1911).

The question now before the Court is whether this venerable practice is legally protected from the legislative intrusion resulting from the Graves Act. We hold that it is not.[17]

This issue of legislative power to preclude judicial suspension of sentences may be thought of as subsumed in the larger issue of power to enact mandatory sentencing laws in the first place. As suggested above, that latter power would not amount to much if it did not include the former. A recent confirmation of

---

sentences under Graves, but rather an obviously inadvertent inclusion of conditions that make no sense.

[17]Almost unanimously, other jurisdictions have held that the suspension of sentences is not an inherent power of the judiciary protected by the separation of powers doctrine. *See People v. Tanner,* 24 *Cal.*3d 514, 156 *Cal.Rptr.* 450, 596 *P.*2d 328 (Cal.1979); *State v. Normand,* 285 *So.*2d 210 (La.1973); *State v. Farmer,* 324 *A.*2d 739 (Me.1974); *Commonwealth v. Jackson,* 369 *Mass.* 904, 344 *N.E.*2d 166 (Mass.1976); *Delaney v. State of Oklahoma,* 507 *P.* 2d 564 (Okl.Cr.1973); *State v. Butterfield,* 12 *Wash.App.* 745, 529 *P.*2d 901 (Ct.App.Wash.1974); but a statutory limitation on the power to suspend sentences was held to violate separation of powers in *State v. McCoy,* 94 *Idaho* 236, 486 *P.*2d 247 (Idaho 1971).

the power to mandate imprisonment is found in our *dictum* in *State v. Bausch,* 83 *N.J.* 425 (1980), where we noted that "the judiciary has no power . . . to lessen or reduce a sentence where the Legislature has provided a mandatory penalty . . . ." *Id.* at 433. To the same effect, see *State v. Fearick,* 69 *N.J.* 32, 38 (1976), and the more specific application of the doctrine to suspension of sentences found in the Appellate Division decision in *Fearick,* 132 *N.J.Super.* 165, 170 (1975).

We dealt with the suspension issue directly in *State v. Johnson,* 42 *N.J.* 146 (1964), in which defendant appealed from the three month custodial sentence then mandated by *N.J.S.A.* 39:4–50 for second offenders under our drunken driving laws. In response to her contention "that legislation prescribing mandatory sentences invalidly impinges upon an inherent judicial power to suspend the imposition or execution of sentences," 42 *N.J.* at 174, we said:

> It is clear that, before and quite apart from statutory authority, New Jersey courts did exercise what they considered to be an inherent power to suspend the imposition or execution of sentences of imprisonment upon a conviction for crime. The present existence or extent of any inherent power has now become largely academic by reason of the adoption of probation statutes and the suggestion that a state legislature cannot validly remove any that remains by mandatory sentence provisions in particular situations is of doubtful merit. We certainly think that power cannot successfully be questioned at least with respect to the type of offense here involved and in view of the short term of imprisonment required. [*Id.* at 174–75 (citations omitted)].

Similarly we conclude that the "power cannot successfully be questioned at least with respect to the type of offense here involved . . . ," even though the mandated term of imprisonment is substantial. The public interest involved, prevention of violent crime, is most important—some would say second to none—and the legislative responsibility and power paramount. Given this substantial public interest and the clear legitimacy of the legislative power, we hold its exercise constitutionally permissible in this instance.

## VI.

◼ Defendant Des Marets contends that his sentence amounts to "cruel and unusual punishment." *N.J. Const.* (1947),

Art. I, par. 12.[18] In considering this claim, we inquire whether the nature of the criticized punishment shocks the general conscience and violates principles of fundamental fairness; whether comparison shows the punishment to be grossly disproportionate to the offense; and whether the punishment goes beyond what is necessary to accomplish any legitimate penal aim. *State v. Hampton,* 61 *N.J.* 250, 273–74 (1972). The showing that must be made to sustain the claim is substantial. *See, e.g., State v. Fearick, supra,* 69 *N.J.* 32 (1976).

■ Given the magnitude and severity of the problem of violent crime, we do not find that the sentence in the Graves Act applied to this case constitutes cruel and unusual punishment under our Constitution. We cannot, of course, foreclose the possibility that in some future case, the Act as applied might amount to cruel and unusual punishment.

### *Appleton*

■ On July 17, 1981, the Burlington County Grand Jury returned a four count indictment against defendant Jeffrey Appleton. The indictment charged Appleton with armed robbery, unlawful possession of a handgun, aggravated assault and possession of a pistol. He had also been charged with burglary in another indictment.

Defendant pleaded not guilty. Thereafter he appeared before the trial court and pursuant to a plea bargain retracted his plea and pleaded guilty to armed robbery, a violation of *N.J.S.A.* 2C:15–1. This is a Graves Act offense. *N.J.S.A.* 2C:43–6(c). The State agreed to recommend that the remaining charges be dismissed and that Appleton be sentenced as a second degree offender.

At sentencing, Appleton, then 20 years old, requested that he be sentenced to an indeterminate term at the Youth Correction-

---

[18]Defendant does not claim that his sentence violates the "cruel and unusual punishment" provision of the United States Constitution.

al Institution Complex pursuant to *N.J.S.A.* 2C:43–5, with three years of parole ineligibility for the Graves Act offense. The court held that it could not do so because a period of parole ineligibility is inconsistent with an indeterminate term as provided in *N.J.S.A.* 2C:43–5. The court therefore sentenced Appleton to a seven year term of imprisonment, including a three year minimum period of parole ineligibility.

Defendant appealed and we granted direct certification.

We have already concluded in *Des Marets* that the Graves Act does not permit indeterminate sentencing for youthful offenders. There remains the issue of whether a youthful offender, sentenced to a mandatory minimum term, may be sentenced for such term to the Youth Correctional Institution Complex rather than to a State prison. Defendant Appleton has requested such sentencing; and his desire is understandable. Conditions in our State prison may erode, rather than enhance, the possibility of rehabilitation. Because of the compelling advantages, for rehabilitative purposes, of the Youth Correctional Institution Complex compared to State prison, we have held that courts should sentence youthful offenders to a youth correctional institution "unless good·and substantial reasons exist for not so doing." *State v. McBride,* 66 *N.J.* 577, 580 (1975).

However, *N.J.S.A.* 2C:43–5 and *N.J.S.A.* 30:4–148 preclude this result for Graves Act offenders. As previously noted, *N.J.S.A.* 2C:43–5 permits youthful offenders to be sentenced to indeterminate terms at the Youth Complex pursuant to *N.J.S.A.* 30:4–148. By its terms, *N.J.S.A.* 30:4–148 provides that courts in sentencing "shall not fix or limit the duration of sentence." The import of this language is clearly that "a minimum may not be fixed when sentencing to a reformatory." *State v. Hopson,* 114 *N.J.Super.* 146, 150 (App.Div.) (Halpern, J.A.D., dissenting), rev'd on dissent, 60 *N.J.* 1 (1971). Because all Graves Act offenders, youthful offenders included, must be sentenced to minimum terms of incarceration of at least three years, no discretion exists to allow a court to sentence such an offender to the Youth Complex.

This problem is not new to this Court. As held in *State v. Spinks*, 66 *N.J.* 568, 575 (1974):

> Perhaps a sentencing judge should have the power to sentence a youthful offender to the Complex, but fix a minimum term that must be served. However, this would require an amendment to *N.J.S.A.* 30:4–148.

S.1691, presently under consideration, is just such an amendment. This proposed bill would explicitly provide that youthful offenders sentenced to mandatory minimum terms may serve those terms at the Youth Complex. Absent passage of this or a similar amendment, however, we are constrained to hold that sentences for mandatory minimum terms must be served at State Prison.[19] Accordingly, we affirm the judgment below.

## The Dissenting Opinion

The dissent's argument that the Graves Act does not repeal the sentencing provisions applicable to young adult offenders by implication is based on the statutory construction principles of the Code, the common law rule of strict construction of criminal laws, and the factual conclusion that the statutes are compatible. Noting that many young adults will go to jail for these offenses under *N.J.S.A.* 2C:43–5, that some, in any event, will be sentenced under the Graves Act (since their treatment as youthful offenders is optional) and that deterrence is a factor that will be considered by trial judges in sentencing young offenders (especially where Graves Act offenses are involved), it concludes that the statutes are not repugnant to each other and, given the longstanding sentencing scheme covering young adults, so recently reenacted as part of the Code (and presumably fully known to the Legislature), it concludes the Legislature could not have intended this partial repeal by silence.

---

[19]Youthful offenders with minimum terms may nonetheless be administratively transferred to the Youth Complex to serve their prison sentence. *N.J.S.A.* 30:4–85. "Indeed, a sentencing judge, in an appropriate situation, should include in the judgment of conviction a provision that the offender be immediately evaluated for potential transfer to a Youth Complex facility to serve the minimum-maximum sentence imposed." *State v. Spinks, supra,* 66 *N.J.* at 576.

Legislative intent therefore is the only issue. The interpretive principles of the Code, the rule of strict construction of criminal laws, and the presumption against implied repealers all give way if the Legislature clearly intended the Graves Act to apply to young adult offenders.

The dissent totally misses the point of the Graves Act. The legislative purpose was to stop gun-related crimes, not just half of gun-related crimes. Its method, through this law, was to announce that anyone who had a gun in his possession while committing certain crimes would—with certainty—go to jail, and—with certainty—for three years. The certainty, not the possibility, not the probability, of not one day less than a three year prison term is the whole point, the very heart, of the Graves Act. The Legislature's hope was that the unprecedented severity and certainty of punishment attached to the possession of a gun would stop criminals from carrying them. The law's all-encompassing intention is apparent: it covered every crime where experience indicated guns were most likely to be used.

More than half of these crimes are committed by young adults between the ages of 18 and 25. It is inconceivable that the Legislature would leave them out of this law. Yet that is precisely what the dissent does. There is no certainty of punishment, no certainty of three years in prison for that group. When they put the gun in their pocket, all they know is they *may* go to prison, they may not, they *may* go for three years, they may not. The heart of the law is cut out of it if there is no certainty of State prison for three years. It may be Yardville (a youth correctional institution), and it may be for only two months, or six months. Deterrence through the *certainty* of severe punishment is lost. That is the kind of deterrence that the Legislature sought to achieve through this Act. The dissent will not allow it. It is satisfied with the *possibility* of punish-

ment.[20]   The Legislature wanted *certainty*.   Its achievement is not possible if Graves applies to less than half of the offenders.[21]

The dissent concludes despite the statute's unqualified use of the word, that "possession" means "possession with intent to use firearms in the course of committing the statutorily enumerated crimes."  90 *N.J.* at 105.  It notes that if mere "possession" is all that is required, there would be no need to attach Graves Act consequences to the "use" of a firearm, since presumably every time one is used, it is also possessed.  Obviously, however, the same may be said about the dissent's definition of "possession": every time a firearm is used, it presumably, at least for some period, was possessed with the intention of being used.  The

---

[20]The critical statistic that the dissent does not mention is that, without the Graves Act, only 9 percent of young adult offenders committing these crimes where a firearm was present were imprisoned for three years or more (1977 statistics).  The deterrence of the dissent would be less than one-tenth of what the Legislature intended if this sentencing pattern continued under Graves.  This greatly diminished deterrence applies to more than half of those who commit these crimes.  They can carry a gun knowing the odds are 10–1 they will *not* get a mandatory three year term.

The dissent assumes, 90 *N.J.* at 99, n. 5, that more young adult offenders will be sentenced to prison because of the Graves Act even if indeterminate sentencing to a youth correctional institution is a permissible option.  Given the sentencing pattern prior to Graves, with only 9 percent of Graves Act offenders incarcerated for three years or more, it seems more likely that judges will be most reluctant to sentence these offenders to prison, since the shorter terms formerly available will no longer be a sentencing option.  Given the choice between three years' mandatory imprisonment and an indeterminate sentence to a youth correctional institution, it seems probable that even *more* young adult offenders will receive an indeterminate sentence after Graves, and because of it.

[21]The dissent is mistaken when it states that "[t]he majority assumes that all young adult 'Graves Act' offenders would be given indeterminate terms and subject to immediate or early release if *N.J.S.A.* 2C:43–5 is not deemed to be repealed."  90 *N.J.* at 99, n. 5.  What the majority does assume—correctly—is that *no* young adult would know with certainty that a three year prison term awaits him if he commits a Graves Act offense; that *all* young adult offenders, if the dissent prevailed, could hope, with reason, as they leave home with their gun, that if they are caught, the worst that will happen is that they might be sentenced to an indeterminate term.

dissent, furthermore, ignores the fact that possession with intent to use unlawfully (presumably that is the same quality of possession the dissent has in mind) is, by itself, a Graves Act offense, since that is precisely what the first statute referred to in the Graves Act, *N.J.S.A.* 2C:39–4a refers to. Under the dissent's construction, therefore, it would *never* be necessary to prove murder, manslaughter, aggravated assault, kidnapping, or any of the other offenses, since the accompanying "possession" (as defined by the dissent) would be sufficient in and of itself to trigger the Graves Act.

The certainty of punishment is further diminished by the requirement of intent that the dissent adds to "possession." While the difference between the dissent and the majority on this issue may not seem important at first glance (since "possession" in connection with the enumerated crimes will usually support a factual inference of intent to use), the dynamics involved in handling a Graves offense suggest that the difference may indeed be quite important. All of those involved in the criminal justice system, police officer, investigator, assistant prosecutor, prosecutor, probation officer, are fully aware of the drastic consequences that follow a Graves Act conviction. In many cases the community pressure is intense to find some way to spare the defendant, to give him something less than three years in prison. Added to this pressure is the deep conviction of many in the criminal justice system that the Graves Act is wrong, that its severity is cruel, and unjustified by any likelihood of achieving deterrence. It would be naive to believe that it would be rare for someone to take advantage of this loophole that the dissent's definition builds into the law. There can be little doubt that in some of these cases, those whose conduct fits within the dissent's definition will, because of that definition, avoid the three year mandatory imprisonment.

At the core of the dissent's misapprehension of this law is its failure, again, to understand the intent of the Legislature to deter the possession of guns. Deterrence is diluted to the extent

that when these crimes are committed, something in addition to possession is required; the maximum in deterrence is achieved by requiring possession and nothing more. The Legislature knew that a person who carries a gun is liable to kill you. The purpose of the legislation was to change the criminal's habits, not his intentions. The purpose was to take the gun out of his pocket. The Legislature should be given a chance to achieve that purpose. The dissent's definition of possession when added to its elimination of more than half the offenders, takes that chance away.

The dissent calls the majority's interpretation of the Graves Act "extraordinarily harsh ... unwarranted and unjust." 90 *N.J.* at 90. We submit it is the Graves Act that is harsh and not our interpretation of it. The Legislature has a right to be harsh if that is what it thinks is required to stop violent crime. The judiciary should regard that harshness as a clear indicator of legislative intent, not as an excuse to undo it. The Legislature obviously regarded violent crime as one of the most serious crimes facing society. Its clear intention was to punish gun-related offenders with extreme, unprecedented severity, and with absolute certainty. The conclusion that the same Legislature that passed such a law would exempt more than half the offenders defies common sense.

### Conclusion

For the reasons stated, we affirm the judgment of the Appellate Division in *Des Marets* and that of the trial court in *Appleton.*

HANDLER, J., dissenting in part and concurring in part.

The sentencing provision applicable to young adult offenders, *N.J.S.A.* 2C:43–5, is a long-standing statutory scheme that was re-enacted as part of the New Jersey Code of Criminal Justice.

It provides for indeterminate custodial sentences of eligible young adult offenders to the Youth Correctional Institution Complex. The recently enacted Graves Act, *N.J.S.A.* 2C:43–6c, requires the imposition of a three year minimum sentence to State Prison without parole eligibility for persons who use or possess a gun in the course of committing certain crimes. The major question presented by both of these appeals is whether *N.J.S.A.* 2C:43–6c impliedly repeals the sentencing provisions relating to young adult offenders, *N.J.S.A.* 2C:43–5. An additional question presented in the *Des Marets* appeal is whether the Graves Act applies to an offender who simply possesses a firearm that is stolen during a burglary without the intent to use that weapon against persons in the commission of the crime or for purposes of escape. The majority concludes that the *N.J.S.A.* 2C:43–6c impliedly repeals the young adult offenders sentencing statute. It also concludes that its mandatory sentencing provisions apply to a person possessed of a firearm without an intent to use it for the commission of a crime. I disagree with these conclusions and therefore dissent.

I

The Graves Act is a sentencing statute of unusual severity. The required sentence under the Graves Act is an immutable three year jail term in State Prison. It applies following a determination of guilt of certain substantive crimes when a convicted offender is shown in a pre-sentencing hearing to have used or possessed a firearm during the commission or attempted commission of the crime. These crimes generally involve violence or the threat or risk of violence against persons. They are murder (*N.J.S.A.* 2C:11–3), manslaughter (*N.J.S.A.* 2C:11–4), aggravated assault (*N.J.S.A.* 2C:12–1b), kidnapping (*N.J.S.A.* 2C:13–1), aggravated sexual assault (*N.J.S.A.* 2C:14–2a), aggravated criminal sexual contact (*N.J.S.A.* 2C:14–3a), robbery (*N.J.*

*S.A.* 2C:15–1), burglary (*N.J.S.A.* 2C:18–2), escape (*N.J.S.A.* 2C:29–5) and possession of a firearm with intent to use it against the person of another (*N.J.S.A.* 2C:39–4a).[1]

The Graves Act is not self-defining or self-explanatory. Its language, and the majority's painstaking interpretation of its provisions, underscore the Act's lack of clarity. The statutory terms are obviously "susceptible of differing constructions." *N.J.S.A.* 2C:1–2c. Judicial interpretation to ascertain its true meaning is therefore imperative. In addressing this task, however, the majority has failed to apply the principles of statutory construction prescribed by the Legislature itself in the New Jersey Code of Criminal Justice as well as traditional interpretive approaches designed to give fair meaning to criminal stat-

---

[1]The Graves Act, *N.J.S.A.* 2C:43–6c, as originally enacted, applied to all defendants convicted under *N.J.S.A.* 2C:39–4a which prohibits possession of a gun with intent to use it against the person or property of another. It was amended in 1982 to apply upon conviction of *N.J.S.A.* 2C:39–4a only when the defendant intends to use the gun against a person. *L.*1982, *c.* 119, § 1. The Graves Act as amended states:

  . A person who has been convicted under 2C:39–4a. of possession of a firearm with intent to use it against the person or another, or of a crime under any of the following sections: 2C:11–3, 2C:11–4, 2C:12–1b., 2C:13–1, 2C:14–2a., 2C:14–3a., 2C:15–1, 2C:18–2, 2C:29–5, who, while in the course of committing or attempting to commit the crime, including the immediate flight therefrom, used or was in possession of a firearm as defined in 2C:39–1f., shall be sentenced to a term of imprisonment by the court. The term of imprisonment shall include the imposition of a minimum term. The minimum term shall be fixed at, or between, one-third and one-half of the sentence imposed by the court or 3 years, whichever is greater, or 18 months in the case of a fourth degree crime, during which the defendant shall be ineligible for parole. The minimum terms established by this section shall not prevent the court from imposing presumptive terms of imprisonment pursuant to 2C:44–1f.(1) except in cases of crimes of the fourth degree. A person who has been convicted of an offense enumerated by this subsection and who used or possessed a firearm during its commission, attempted commission or flight therefrom and who has been previously convicted of an offense involving the use or possession of a firearm as defined in 2C:44–3d., shall be sentenced by the court to an extended term as authorized by 2C:43–7c., notwithstanding that extended terms are ordinarily discretionary with the court.

utes. As a result, it has given the Graves Act an extraordinarily harsh interpretation which is, I believe, unwarranted and unjust.

The Legislature has prescribed standard rules of construction of all Code provisions. *N.J.S.A.* 2C:1–2c. Several of these standards apply directly to the sentencing provisions of the Code. They emphasize the objectives of discretionary, enlightened, fair and individualized sentencing, *e.g., N.J.S.A.* 2C:1–2b (2), (4), (5), (6) and (7). The Legislature has not in any way intimated that these statutory principles of interpretation should not govern the sentencing provisions of the Graves Act and those applicable to young adult offenders.

Furthermore, as a penal statute, the interpretation of the Graves Act is still influenced by, if not subject to, the traditional principle of strict construction. *Neeld v. Giroux,* 24 *N.J.* 224, 229 (1957); *State v. Brenner,* 132 *N.J.L.* 607, 611 (E. & A. 1944). It is difficult to imagine a rule of construction of greater importance and durability. *See United States v. Wiltberger,* 18 *U.S.* (5 Wheat.) 76, 95, 5 *L.Ed.* 37, 42 (1820) (Marshall, C.J.). Thus, as a penal statute, the Graves Act's operative provisions cannot be extended by implication. *Brenner,* 132 *N.J.L.* at 611; *State v. Fair Lawn Service Center, Inc.,* 20 *N.J.* 468, 472 (1956). This rule of strict construction "is designed to narrowly confine the scope of the conduct covered, or the penalty applicable to such conduct, so as to avoid fundamental unfairness which might result when those penalized could arguably be said to have misunderstood positive law, or, more realistically, so as to avoid the unfairness of arbitrary enforcement." *State v. Maguire,* 84 *N.J.* 508, 514 n. 6 (1980). The rule has been said to have its derivation in the requirement of due process, *In Re Suspension of DeMarco,* 83 *N.J.* 25, 36 (1980), and in fundamental fairness, *State v. Maguire.*

This cautionary approach is especially warranted with respect to a penal statute that carries such drastic consequences as the Graves Act. It is highly germane in addressing each of the major issues in these appeals relating to whether the Graves Act

has supplanted the young adult offender sentencing provisions of the Code and the extent of the coverage of the Graves Act. To fail to accord this statute a strict construction consistent with the interpretive principles of the Code itself is to countenance arbitrary enforcement and grave injustice in its individual applications.

II

The issue as to whether the Graves Act impliedly repeals the sentencing scheme relating to young adult offenders is raised in both appeals. In *Des Marets,* the trial judge sentenced this 18-year old defendant under the Graves Act. He determined that the court is "without discretion" to impose any sentence other than the three year minimum jail term under *N.J.S.A.* 2C:43–6c. Nevertheless, the court added that "[m]y sentence would have been a sentence to the Youth Reception and Correction Center at Yardville for an indeterminate term not to exceed three years, which would have had the practical effect of an approximate eight or nine month sentence...." In *Appleton,* the sentencing court similarly stated that defendant was otherwise eligible to be sentenced to an indeterminate term but could not be under the preemptive mandatory provisions of the Graves Act.

*N.J.S.A.* 2C:43–5 authorizes a court to sentence a young adult offender to an indeterminate term at the Youth Correctional Institution Complex, in accordance with *N.J.S.A.* 30:4–146 to –148. *N.J.S.A.* 30:4–148 states that "courts in sentencing pursuant to *N.J.S.* 2C:43–5 shall not fix or limit the duration of the sentence, ..." although the court must specify the maximum sentence imposed. The majority concludes that these provisions for sentencing young adult offenders are impliedly repealed because they cannot be reconciled with the Graves Act. *Supra* at 76.

I disagree. In my estimation the sentencing provisions for youthful offenders and the Graves Act can be fairly and reason-

ably construed in a manner that gives effect to both statutes. Courts are adjured to harmonize seemingly inconsistent statutes. Consequently, in a case such as that presented by the statutes involved in these appeals, the strong presumption in the law against implied repealers is not surmounted. *See Brewer v. Porch,* 53 *N.J.* 167, 173 (1969). The judicially declared repeal of statutes should be undertaken only when it is abundantly clear that the Legislature itself intended to cancel one statute by enacting another. For that reason, courts properly insist that the legislative intent to repeal an earlier statute be manifest, *State v. States,* 44 *N.J.* 285, 291 (1965), and expressed clearly by the terms of the statute or indisputably reflected in its legislative history. *See State v. Reed,* 34 *N.J.* 554, 561 (1961). In order to repeal an earlier enactment by implication, a later statute must allow no other result and admit of no other reasonable interpretation. It must clearly exclude any possibility for the coexistence of both pieces of legislation. *See State v. States,* 44 *N.J.* at 291.

The question posed by these appeals—whether mandatory sentencing provisions have by implication repealed existing sentencing schemes, and particularly, those applicable to young adult offenders—has been considered previously by our courts on several occasions. These decisions illustrate the rarity of hypothesizing a legislative intent to effect such a significant repeal by indirection or implication.

In *State v. Hopson,* 60 *N.J.* 1 (1971), *rev'd on dissent,* 114 *N.J.Super.* 146, 150 (App.Div.1971), the Court was faced with a conflict between the minimum sentence required under the Uniform Narcotic Drug Act, *N.J.S.A.* 24:18–47(c)(1), and the limits imposed by *N.J.S.A.* 30:4–148. In allowing the indeterminate term, this Court adopted Judge Halpern's dissent, which emphasized the Legislature's desire to treat young offenders separately:

Unquestionably, the Legislature, for about 70 years has felt that such persons had a better chance to be rehabilitated under an indeterminate sentence and returned to society as a useful member thereof, than persons not in that

category. If the Legislature intended to break away from this longstanding philosophy of reformatory sentencing, it would have done so by specifically creating an exception in narcotic offenses. [114 *N.J.Super.* at 151 (citation omitted)]

It is noteworthy in *Hopson* that the Legislature provided for mandatory sentences in the Uniform Narcotic Drug Act in order to maximize its goal of deterrence for a particular class of offenders, which assuredly included young adults in substantial numbers. Despite the Act's inclusion of mandatory sentences which would make certain that convicted offenders served a fixed period of time in State Prison, the Court held that the Act did not abrogate the statutory provisions that permit the imposition of indeterminate sentences for young adult offenders. The parallel to the current Graves Act is clear. The majority does not meaningfully distinguish the penal purpose of the Uniform Narcotic Drug Act which was the subject of *Hopson* from that of the Graves Act which is the subject of these appeals. Its assertion that the latter is intended to be more severe because only the Graves Act imposes both a minimum sentence and parole ineligibility, *supra* at 74–75, hardly differentiates the equally serious legislative penal concerns that were evident in fashioning the mandatory sentences applicable to narcotics offenders in *Hopson*. These concerns, though genuine and documented, were nevertheless found wanting as a basis for an implied repeal of the young adult offenders sentencing scheme. A clear and unmistakable basis for such an implied repeal in these cases is similarly lacking.

*State v. Brozi*, 125 *N.J.Super.* 485 (App.Div.1973), certif. den., 64 *N.J.* 501 (1974), involved a similar conflict, this time between the kidnapping statute with its 30-year minimum sentence, *N.J.S.A.* 2A:118-1, and the requirements of *N.J.S.A.* 30:4–148, which proscribes a sentence of a fixed minimum duration for young adult offenders. Again, the court gave great weight to the purpose behind reformatory sentences, placing the burden on the Legislature to preclude indeterminate sentences specifically if it wishes to do so. An indeterminate sentence was

allowed, despite the serious nature of the offense. Similarly, in *State v. Prewitt,* 127 *N.J.Super.* 560, 565 n. 1 (App.Div.1974), the court noted: "Mandatory minimum sentences, sometimes contained in our statutes, are inapplicable when the sentence is indeterminate."

Recently, the Law Division in *State v. Ribbecke,* 185 *N.J.Super.* 65 (Law Div.1982), held that a sentencing court has the authority to impose an indeterminate term at Yardville for a twenty-four year old man who was convicted of manslaughter for accidentally shooting his best friend. The court reasoned:

> *N.J.S.A.* 2C:1–2 directs the courts to construe the code so as to "give fair warning of the nature of the sentences that may be imposed on conviction of an offense" and to "differentiate among offenders with a view to a just individualization in their treatment." In *State v. McBride,* 66 *N.J.* 577, 580 (1975), the court expressed this philosophy: "A youthful offender eligible for sentence to the Complex should ordinarily be sentenced there unless good and substantial reasons exist for not so doing." Since the Code provides that *any person* under 26 years of age may be sentenced to the reformatory, and since the Graves Act does not expressly forbid such treatment and prior case law urges it, there is no doubt that to meet the Code's requirement of "fair warning" regarding sentencing alternatives, this court must resolve the conflict by following the prior cases and deciding that a defendant who comes within the youthful offender category may be committed to a reformatory without a minimum term or to State Prison if the court believes that application of a minimum term is appropriate. [*Id.* at 71.]

This position is consistent with that of other jurisdictions. *See, e.g., United States v. MacDonald,* 455 *F.*2d 1259 (1 Cir.1972), *cert.* den., 406 *U.S.* 962, 92 *S.Ct.* 2070, 2073, 32 *L.Ed.*2d 350 (1972); *United States v. Colamarco,* 320 *F.Supp.* 616 (E.D.N.Y. 1970); *Whitlock v. State,* 404 *So.*2d 795 (Fla.App.1981); *Commonwealth v. Hayes,* 372 *Mass.* 505, 362 *N.E.*2d 905 (Mass.1977).[2]

---

[2]In *State v. Robinson,* 139 *N.J.Super.* 58 (App.Div.1976), certif. den., 75 *N.J.* 534 (1977), it was held that an individual sentenced by a jury to a mandatory life term for first degree murder may not be resentenced by a judge to the Youth Complex for an indeterminate term. The basis for the *Robinson* decision—the existence of a single mandatory penalty for a single crime—is not present with respect to the wide range of potential Graves Act offenders and offenses. *See State v. Ribbecke,* 185 *N.J.Super.* 65, 70 (Law Div.1982).

As noted, special sentencing provisions for young adult offenders have been a part of our criminal laws for many years, and were expressly re-enacted in 1978 with the adoption of the New Jersey Code of Criminal Justice. In effect, the Legislature reconfirmed the judicial authority to sentence those under 26 years of age to indeterminate terms of confinement at youth correctional institutions. The sentencing provisions for young adults were carefully integrated with the total sentencing scheme of the Code. *N.J.S.A.* 2C:43–5 explicitly permits judges to impose such a sentence "instead of the sentences otherwise authorized by the code." It is difficult to believe that the Legislature, having included the young adult offenders provision in the sentencing framework of the new Code, would silently repudiate this significant legislation just a short time later.

Furthermore, there is no hint in the language of the Graves Act or its legislative history that the Legislature believed there was any actual or potential conflict between the two laws or purposefully set about to repeal the entire sentencing scheme for young adult offenders. Indeed, the two statutory schemes by their terms are coordinate and reconcilable in application. Together, they present a comprehensive sentencing approach. Their application would result in Graves Act sentences to State Prison for the fixed three-year minimum being applied to all adult offenders twenty-six years of age and over if guilty of covered gun crimes; they would also result in such sentences for all convicted offenders under the age of twenty-six committing Graves Act crimes who did not receive indeterminate sentences under *N.J.S.A.* 2C:43–5. Finally, only those "Graves Act" offenders under age twenty-six, who, as a matter of discretion exercised under *N.J.S.A.* 2C:43–5 were not sentenced to State Prison, would receive indeterminate terms.

The majority's conclusion that the two statutes are in fundamental conflict rests on pure hypothesis. The majority attributes an intent to the Graves Act that, it asserts, is inconsistent with the recognized purpose of the young adult offenders sentencing provisions.

I can agree that the overriding purpose of the Graves Act is deterrence. I can also agree that the Legislature sought to achieve its goals of deterrence by fashioning a sentencing scheme that would increase sentencing severity and certainty for particular offenses. However, the majority's conception of the Graves Act extends its deterrence consequences much further. It assumes, without discernible support in the statutory language or history, that the Legislature sought to eliminate sentencing discretion traditionally available for young adult offenders with respect to Graves Act offenses. This assumption is apparently founded upon the belief that the sentencing provision for young adult offenders disavows deterrence as a goal and, for that reason, its continued survival alongside the Graves Act will destroy the deterrence purpose of the latter. The infirmity in this reasoning—that the purposes of the respective enactments are repugnant to each other—fails to recognize that the values of deterrence are a constituent part of *N.J.S.A.* 2C:43–5.

First, it must be emphasized that there is nothing that compels that a young adult offender be sentenced under *N.J.S.A.* 2C:43–5. *N.J.S.A.* 2C:43–5 permits—it does not mandate—the imposition of an indeterminate sentence for youthful offenders. The judicial authority under the young adult offenders provision contemplates that deterrence, as well as rehabilitation, is a goal to be considered in the individual case. Further, the Code of Criminal Justice includes among the objectives of sentencing, in addition to rehabilitation, the prevention and condemnation of criminal acts and general and specific deterrence of crime. *N.J.S.A.* 2C:1–2b(1) to (3). *See In re Trantino Parole Application,* 89 *N.J.* 347 (1982). These sentencing goals are clearly relevant in the sentencing of young adult offenders. *State v. Marzolf,* 79 *N.J.* 167 (1979); *State v. Jones,* 76 *N.J.* 208, 212 (1978) (quoting *State v. Jones,* 66 *N.J.* 563, 568 (1975)); *see State v. Spinks,* 66 *N.J.* 568, 575 (1975); *cf. State in the Interest of C.A.H. & B.A.R.,* 89 *N.J.* 326, 336–37 (1982) (punishment, deterrence and rehabilitation should be balanced in waiving juvenile

court jurisdiction); *State in the Interest of B.C.L.*, 82 *N.J.* 362, 377–78 (discussing the principles of the juvenile justice system).

In view of the deterrence standards that are a part of the young adult offenders sentencing scheme, it is gratuitous to impute a legislative intent to abrogate this sentencing methodology. The Graves Act can be seen as modifying—but not abolishing—this sentencing structure. As noted, the framers of the Code of Criminal Justice incorporated the young adult offenders provisions of the reformatory law into the Code "as a sentencing alternative." II *The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission* 316 (1971). Juxtaposed with the young adult offenders scheme, the Graves Act should be viewed as a major alteration of the equation applicable to the sentencing of young adults. It has changed the comparative weight to be attributed to the factors that must be balanced in sentencing. In effect, the Graves Act itself will become a critical, if not dominant, consideration to be weighed in the exercise of this sentencing discretion with respect to crimes committed with firearms. And, in light of the extant Code standards calling for certainty, predictability, consistency and uniformity in sentencing, *In re Trantino*, 89 *N.J.* at 368; see I *The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission* at xiv, there is strong reason to conclude that the Legislature fully understood that the Graves Act policy would be relevant in the continued application of the young adult sentencing provisions.[3]

---

[3]Pertinent to this discussion is *S.* 1691, currently being considered by the Legislature, which would add the following language to *N.J.S.A.* 2C:43–5:

> This section shall not apply to any person less than 26 years of age at the time of sentencing who qualifies for a mandatory minimum term of imprisonment without eligibility for parole, pursuant to subsection c. of N.J.S. 2C:43–6; however, notwithstanding the provisions of subsection c. of N.J.S. 2C:43–6, the mandatory minimum term may be served at the Youth Correctional Institution Complex or the Correctional Institution for Women.

The Court surmises from statistics that unless the Graves Act were enforced unencumbered by the young adult offenders scheme, a majority of offenders under the Graves Act will escape sufficient punishment. Although statistics marshalled by the majority show that a substantial percentage—59 percent— of Graves Act crimes are perpetrated by young adults, *supra* at 77, it does not follow that attacking this evil—punishing these young offenders—requires the abrogation of the young adult offenders provisions. Available statistics also demonstrate that prior to the enactment of the Graves Act, about half of the young offenders committing the same gun-related crimes, who were eligible for indeterminate sentencing, were in fact sentenced to fixed terms of imprisonment appropriate for adult offenders.[4] Surely, even without the repeal of the young adult offenders scheme, the number and severity of jail terms for young adult offenders committing "Graves Act" offenses will continue to grow.[5]

---

The State has argued that "*S.*1691 clearly does not constitute evidence that the Legislature originally intended indeterminate sentences to be available for Graves Act offenses. The proposed amendment is, rather, a necessary recognition that the legislature intent of the Graves Act is being frustrated by judicial misinterpretation of its provisions." The sponsor's statement, referring to "a loophole in current law," is not dispositive. That is simply the sponsor's belief and, indeed, if this amendment is adopted by the current Legislature, it may reflect its belief as well. However, it does not follow that the Legislature when enacting the Graves Act inadvertently left a gap or loophole in the law.

[4]The Administrative Office of the Courts has indicated that the most recent pre-Graves Act statistics available are for the year 1977.

[5]The majority assumes that all young adult "Graves Act" offenders would be given indeterminate terms and subject to immediate or early release if *N.J.S.A.* 2C:43–5 is not deemed to be repealed. *Supra* at 77. This assumption is not borne out by available statistics. Prior to the Graves Act, seventy-seven percent of young adult "Graves Act" offenders were incarcerated for some period of time. Thus, a total of 86 percent of *all* Graves Act offenders—77 percent of the young adults and 100 percent of adult offenders—received jail terms prior to the Graves Act. The normal inference to be drawn is that criminals heretofore receiving State Prison terms for gun-relat-

These considerations constitute forceful arguments against imputing to the Legislature an intent to get rid of the sentencing provisions available to young adult offenders committing gun-related crimes. I do not foresee, as does the majority, an inevitable sentencing debacle if we were to recognize, as I believe the Legislature did, the feasible and sensible integration of both sentencing schemes. Regretfully, what I do see under the majority's interpretation is the Graves Act striking individuals clearly not within the contemplation of its harsh sanctions.

## III

The Graves Act provides that a person convicted of particular enumerated crimes who "in the course of committing or attempting to commit the crime, including the immediate flight therefrom, used or was in possession of a firearm" is subject to its mandatory sentencing provisions. *N.J.S.A.* 2C:43–6c. The Act thus applies unmistakably to persons who actually *use* guns while committing particular crimes. The Act also covers persons who *possess* guns during the commission of such crimes. It does not, however, by its own terms expressly describe or define the type of possession that subjects an offender to its mandatory jail term. Determination of the elements of such possession is of critical significance in the *Des Marets* case.

Des Marets was involved in two separate burglaries on March 23, 1981. With respect to the Mason house crimes, in which two handguns were stolen, Des Marets was indicted in five counts charging burglary, theft of property and conspiracy. He was charged in two counts with burglary and theft in connection with the Coulten house crimes, which involved the taking of a radio and other items. Defendant was also charged in a separate indictment in four counts with possession of a handgun

ed crimes will continue to be subject to the Graves Act, that a substantial number of persons previously receiving non-State Prison custodial terms will also be sentenced to State Prison under the Graves Act, and, further, that a substantial number of young adults receiving indeterminate terms will now be sentenced directly under the Graves Act.

without a permit and receiving stolen property. The record does not demonstrate that defendant was in possession of a gun or took one with him when he committed the Coulton burglary.

Defendant pleaded guilty to two counts of burglary, two counts of theft and to the count of possession of a handgun; other charges were dropped. The State agreed to recommend a sentence of 90 days in the county jail plus a probationary period. Des Marets was sentenced by the trial judge only on the third degree burglary charges, *N.J.S.A.* 2C:18–2. When sentenced, the trial court applied the Graves Act on the theory that Des Marets was "in possession of a firearm, albeit the fruits of that particular burglary . . . , upon his departure from the premises." Des Marets received concurrent terms of four years, with three years of parole ineligibility pursuant to the Graves Act.

It is reasonably inferable that the trial court was satisfied, as was the prosecutor, that Des Marets was guilty of third degree burglary. This is crucial in terms of the application of the Graves Act. Third degree burglary differs from burglary in the second degree in that in the latter the offender "is armed with or displays what appears to be explosives or a deadly weapon." *N.J.S.A.* 2C:18–2b. The crime committed by Des Marets was considered a third degree burglary, that is, a burglary in which he neither was armed with nor displayed "a deadly weapon."

Nevertheless, the majority holds that simple possession of a weapon—that is a bare possession without any intent to use it—is covered by the Graves Act and triggers its mandatory sentencing provisions. This conclusion is borne of a permissive reading of the statute, one that could not be reached were the enactment read and interpreted strictly. Moreover, the majority's interpretation is one that should be avoided to prevent the "unfairness of arbitrary enforcement." *State v. Maguire,* 84 *N.J.* at 514 n. 6.

The majority asserts that the definition of "possession" in *N.J.S.A.* 2C:2–1c governs the meaning of this term as used in the Graves Act. *Supra* at 68. However, *N.J.S.A.* 2C:2–1c merely defines when possession constitutes an act for the pur-

poses of the Code. It was never intended to define "the *mens rea* or mental element with which the possession must take place to make possession criminal." II *The New Jersey Penal Code: Final Report of the New Jersey Criminal Law Revision Commission* at 39.

The majority's reading of the statute to cover simple possession without any intent to use a weapon criminally also strains the language of the statute because it transforms the term "used" in the Graves Act into mere surplusage. All criminals who use firearms would, at the very least, be in possession of them. If possession is intended to be all-inclusive, as the majority rules, the Legislature's employment of the term "use" seems pointless. It is not probable that the Legislature would employ so potent a term as "use" as a redundancy. Rather, it is likely that it intended this term to have full and independent force and effect. *See Hoffman v. Hock,* 8 *N.J.* 397, 406 (1952); *Jersey City v. Department of Civil Service,* 7 *N.J.* 509, 520 (1951).[6]

An examination of the crimes to which the Graves Act applies bolsters the conclusion that the Act focuses upon purposeful criminal action of a violent or threatening kind. It is significant that seven of the nine listed crimes are crimes against persons in every instance. For example, a defendant who purposely or knowingly causes death or serious bodily injury resulting in death is guilty of murder. *N.J.S.A.* 2C:11-3. A defendant who unlawfully removes another person in order to facilitate commission of a crime or to inflict bodily injury or terrorize the victim or another person is guilty of kidnapping. *N.J.S.A.* 2C:13-1. Of the listed crimes, only burglary, *N.J.S.A.* 2C:18-2,

---

[6]The countervailing suggestion is that the limited definition of "possession" (*i.e.,* one that requires criminal intent) also renders the term "used" as a mere surplusage. *Supra* at 87. However, the term "used" retains independent significance with the confined definition of possession. It means simply that if a gun is "used" in the commission of a crime, separate proof of intent is not required to establish a Graves Act crime. If, on the other hand, a weapon is not "used," an unlawful intent to use would, in my opinion, be essential to establish the prohibited possession under the Graves Act.

and escape, *N.J.S.A.* 2C:29–5, need not be crimes against persons. Nevertheless, under aggravated circumstances they can also be crimes against persons. Burglary is a second degree crime when an individual "is armed with or displays what appears to be explosives or a deadly weapon;" otherwise, it is a third degree offense. Similarly, escape can threaten persons. It is usually a third degree offense but becomes the more serious second degree crime "where the actor employs force, threat, deadly weapon or other dangerous instrumentality to effect the escape." Thus, these two offenses also constitute crimes of violence comparable to the listed crimes only when a dangerous weapon is used or intended to be used. A construction of all the enumerated crimes as involving the common thread of violence against persons is also consistent with the additional crime specified by the Graves Act, namely, possession of a firearm with intent to use it unlawfully against the person of another (*N.J.S.A.* 2C:39–4a).[7]

Further support for an interpretation of the Graves Act as focusing upon crimes of personal violence can be derived from the Legislature's use of the phrase "in the course of committing." By this phraseology, the Legislature clearly tied the presence of a gun to the commission of the crime. This strongly suggests that the involvement of the gun in the crime would be purposeful or intentional. The same phrase appears in the burglary statute (*N.J.S.A.* 2C:18–2) and the analogous robbery statute (*N.J.S.A.* 2C:15–1). It is derived from the robbery provision of the Model Penal Code. The commentary to Section 222.1 states

---

[7]The suggestion of the majority that *N.J.S.A.* 2C:39–4a renders the enumerated crimes unnecessary if the term possession were given a limited meaning, *supra* at 86, is not sound. The enumerated crimes are serious offenses. It is by no means certain, or even likely, that convictions of crimes of this magnitude would always be accompanied by a separate conviction for unlawful possession of a gun under *N.J.S.A.* 2C:39–4a.

> Section 222.1 thus includes as robbery the conduct of a person who, having obtained or attempted to obtain the property, threatens or uses the specified force to retain the property, to escape, or to prevent pursuit. The thief's willingness to use force against those who would restrain him in flight suggests that he would have employed force to effect the theft had the need arisen. [*Model Penal Code* sec. 222.1 comment (2)(b) ]

A court should strive to pull statutory strands together to give strength to the legislative fabric. A statutory scheme should be construed to achieve internal consistency and interrelated provisions should be read *in pari materia*. *State v. Green,* 62 *N.J.* 547, 554 (1973). The Act makes the best sense and achieves the greatest degree of cogency if it is construed to cover the purposeful possession of firearms with an intent to use them against persons in the course of committing a crime that itself causes or threatens actual or potential violence to individuals, or, is so possessed in the course of escaping from the commission of such crimes.

The Appellate Division in *State v. Stewart,* 186 *N.J.Super.* 517 (1982) (certif. pending), agreed with this interpretation. The court concluded that bare possession of a firearm, not otherwise shown to be connected with the commission of a crime, did not fall within the scope of the Graves Act. In that case, the defendant, who was sitting in a truck, was found to have stolen a plastic bag of marijuana from a victim standing in the street immediately outside the truck. The truck contained a flare gun. Although the defendant was acquitted of armed robbery and illegal possession of the flare gun, he was convicted of unarmed robbery. The trial court sentenced him to a prison term under the Graves Act.

The Appellate Division reversed, stating:

> The obvious conclusion is that although defendant had constructive possession of three items that may have fit the definition of "firearm" in *N.J.S.A.* 2C:39–1(f), he was not "armed" with them during the incident with Hampton because they played absolutely no part in the crime that was committed. There is no evidence that defendant used them for criminal purposes or that they were intentionally possessed for use in a criminal enterprise. [*Id.* at 521]

The court reasoned that the Legislature, in enacting the Graves Act, intended that there be a "nexus" between the fact that the offender is armed and the crime committed. It further recognized that such a holding is consistent with the legislative purpose of the Graves Act:

> The manifest intent of the Graves Act was to penalize more harshly those who arm themselves before going forth to commit crimes. The intent of the Legislature in passing the Graves Act can best be effectuated by interpreting it to mean that the firearm must be used, or be purposefully available for use, to facilitate the actual commission of the crime or to aid in the perpetrator's "get-away." [*Id.* at 520] [8]

The Court is adjured to limit the reach of the Graves Act no further than reasonably required by its language, its sense and its history. In my opinion that would not extend beyond the use of, or the possession with intent to use, firearms in the course of committing the statutorily enumerated crimes. It is, after all, an extremely severe penal statute we are applying. In such circumstances, if there is a margin of error in its interpretation affecting the breadth of its coverage, that margin should be narrowed as much as language reasonably permits to assure fairness and justice in the law's individual applications. A failure to accord a strict interpretation of the Act increases intolerably the risk of injustice and "arbitrary enforcement." *State v. Maguire,* 84 *N.J.* at 514 n. 6. The enduring wisdom of these traditional principles of strict construction has, unfortunately, played no role in influencing the outcome of this appeal, evidenced by the harsh and oppressive fixed three-year State Prison sentence meted out to Des Marets.

---

[8] The legislative history of the Graves Act also lends support to the conclusion that its mandatory sentencing terms apply to violence-laden crimes and to purposeful possession of weapons by offenders during the commission of such crimes. The Assembly Committee Report on *S.*1071, an earlier version of the Graves Act that was vetoed by Governor Byrne, is some evidence of this position: "The purpose of this bill is to make criminals think twice before going forth to commit crimes armed with guns." It is difficult to conclude from this history, as the majority does, that the Graves Act could apply to an individual like Des Marets who stole a handgun but did not in any other way use or intend to use it to perpetrate any crime.

## IV

These several points raise substantial questions as to the application of the penal sanctions of the Graves Act to young adult offenders and the substantive scope of its coverage. In cases of genuine doubt as to the scope of the crime and severity of the penalty to be applied, the rule of strict construction and its corollary, the rule of lenity, counsel that the narrower interpretation be invoked and milder penalty be applied. *Busic v. United States,* 446 *U.S.* 398, 406, 100 *S.Ct.* 1747, 1753, 64 *L.Ed.* 2d 381, 389 (1980) (federal statute authorizing imposition of enhanced penalties for defendants who use or carry a firearm in the commission of a federal felony cannot be applied to defendant who used firearm in commission of a felony that is proscribed by a statute that itself permits enhancement if a dangerous weapon is used); *Bell v. United States,* 349 *U.S.* 81, 83, 75 *S.Ct.* 620, 622, 99 *L.Ed.* 905, 910 (1955); *State v. Wooten,* 73 *N.J.* 317, 326 (1977) (Pashman, J., dissenting) (Appellate Division decision affirmed by equally divided court).

The doubts that generate the need for the strict construction and narrow application of penal laws are especially pronounced in this case. Because of the extreme severity of the penal consequences of the statute—the fixed three-year jail term to State Prison—these doubts must be resolved against the implied repeal of the young adult offender sentencing scheme and the extended coverage of the Act to bare or simple possession. On these grounds, I dissent from the majority's opinion. I concur in the results otherwise reached by the Court.

Justice SCHREIBER joins in this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HERN and GARIBALDI—4.

*Dissenting in part and concurring in part*—Justices SCHREIBER and HANDLER—2.