139 N.J. Super. 290 (1976)
353 A.2d 549
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
ISAAC WILLIAMS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 14, 1975.
Decided February 23, 1976.
*292 Before Judges CARTON, CRAHAY and HANDLER.
Mr. Philip B. Seaton, Assistant Prosecutor, argued the cause for appellant (Mr. Thomas J. Shusted, Camden County Prosecutor, attorney).
Mr. Michael C. Shale, Assistant Deputy Public Defender, argued the cause for respondent (Mr. Stanley C. Van Ness, Public Defender, attorney).
The opinion of the court was delivered by CRAHAY, J.A.D.
On July 3, 1973 defendant was sentenced to a term of not less than 14 nor more than 15 years in New Jersey State Prison, entered on his bargained plea of non vult to a Camden County indictment charging him with the murder of Gene Sellers. The plea agreement included the prosecutor's recommendation that the maximum term not exceed 18 years.
On November 17, 1974 the trial judge, not the original sentencing judge, entered an order which provided that the original sentence 
* * * is to stand. Remainder of Sentence is hereby suspended. Defendant is placed on Probation for a period of five (5) years. Condition of Probation: Defendant is to enter a recognized Drug Rehabilitation (NARCO), as an In-Patient and to successfully complete the Drug Rehabilitation Program. When the Program is completed Camden County Probation Department is to be notified by the Authorities of the Center. * * *
On this appeal, the State challenges the order modifying sentence, advancing essentially an abuse of the trial judge's *293 discretion. Our review of the entire record satisfies us that there was a mistaken exercise of discretion and no warrant for the modification ordered. We reverse.
On March 18, 1973 Gene Sellers was slain as the result of knife wounds. The next day defendant confessed to the crime, alleging that it grew out of a quarrel concerning $20 he had loaned the victim. Defendant did not assert in his statement that narcotics were involved in the incident nor that he was, at the time, under their influence. At the plea retraction hearing defendant crystallized the affair thus 
* * * Gene Sellers had owed me $20 and I saw him that day and asked him about it. Through the course of conversation we began to hassle about it and harsh words traveled between us. We began to fight. The stabbing occurred. That's basically what happened.
Sellers was not armed and at the retraxit hearing defendant specifically disclaimed being under the influence of any stimulant but rather assumed he was in "a state of high anger."
On October 1, 1974, over a year and a half following his incarceration, defendant filed, pro se, a notice of motion to be transferred to a drug treatment facility under R. 3:21-10(a) stating that
* * * I am now of mature mind and character and there is every reason to believe that if given the opportunity for treatment, I would rehabilitate myself and become a useful member of society, accepting all my responsibilities.
The sole purpose of this Motion is rehabilitation by way of treatment for drug addiction.

* * * * * * * *
Thereafter counsel was assigned to defendant and a hearing conducted.
Court C. Fisher testified in favor of defendant's transfer. Fisher was a project supervisor of the Correctional Drug Services unit within the Division of Narcotics and Drug Control. That unit was designed to provide evaluation and referral services for inmates in correctional facilities to community *294 based drug treatment centers. Fisher had met defendant approximately 12 times over a nine-month period and was of the opinion that
* * * given all of the data that I have received on Mr. Williams' case, the best sense of the total evaluation effort appears to be that Mr. Williams at this point in history can best be served by an opportunity to continue a more intensive form of treatment in the community than is available in the institution to deal with his drug history.
Fisher added that he believed defendant to have been a drug user at the time of Sellers' murder and that he would be a "good risk" in a noncustodial environment. We pause to observe that we find no record support for this view by Fisher.
In his own behalf defendant testified and at first recounted his history of narcotics use. At the time of the hearing, November 1974, he was 40 years of age. While in military service in 1954 he first experienced drugs  marijuana and "goof balls." Upon discharge from the military in 1956 he attended college until 1959, apparently without drug use and then
* * * I went back * * * and started using drugs again * * * heroin up until I was arrested in 1961 [for violation of narcotics' laws] and * * * got two to five years, came out of prison in 1963 and went to Chicago * * *.
According to defendant, following his release from prison he remained drug free for about a year and a half but then resumed their use continually until May 1969 when he entered the Eagleville Rehabilitation Center in Pennsylvania where he was both treated and served as a staff member until September of 1971. Then, he said,
* * * I went on to NARCO as a Director of Treatment and Residential Director 71 to 72, October of 72 I transferred to Concept House as a Director of Treatment there up until January of 73. I resigned at Concept and got back into drugs again using cocaine and amphetamines up until the time of my arrest.
*295 At this hearing defendant for the first time claimed that he was under the influence of drugs  intravenously "shooting" cocaine  when he slew Sellers. Defendant opined that there was no cure for addiction and his stated reason for urging a sentence modification was that
* * * I feel with the type of setup NARCO has and what the philosophy there is some terms of dealing with people that have similar problems, old addicts that you can identify with, the positive environment that I'd be able to deal with this in a more intense situation.
Facilities akin to NARCO were not available in State Prison. Defendant stated that he was then "motivated to receive this type of chance."
The record does not make clear the state of defendant's addiction at the time of the hearing. As noted, he stated that addiction could not be cured. He had, however, been drug free for the period of his incarceration. When asked by the judge if he had a present urge to use drugs he replied:
No, I cannot judge that now because of being in a protective environment. I've been in a protective environment. If I'm turned loose in the street, I don't know what might become a problem to me that I may have to face that I could not deal with. I might resort to that. I probably would.
The trial judge considered several letters written by NARCO, Eagleville and the Mercer County Community College urging defendant's transfer.
In granting defendant's motion the trial judge appended a statement of reasons for his action. It included that defendant was due to receive an Arts Degree from the Mercer County Community College and that his contacts with prior drug programs were "quite impressive."
It was noted that the witness Court Fisher "was quite positive that Mr. Williams could not longer receive the attention he should be getting while incarcerated * * *" The judge also *296 quoted from a letter by Dr. Hans Freymuth, medical consultant to the State Department of Health, as follows:
This man is a rather unusual individual, he is proud, angry, intelligent, self-searching, and certainly potentially good and valuable human material, but at the same time potentially dangerous particularly if challenged when his inhibitions are diminished by the use of drugs.
It is felt that he deserves a chance under carefully structured conditions. He wishes to rejoin NARCO and it is felt that probation should be considered to be conditional upon a prolonged stay at this or another therapeutic community. At the same time, prolonged incarceration will probably cause him to become more cynical, bitter and less amenable to changes and successful re-entry to society.
(Dr. Freymuth's letter also noted defendant's age and the "indication" of a 20-year history of drug addiction, "with interruptions," as well as his involvement in other drug programs.)
The trial judge concluded that further incarceration would not aid in defendant's rehabilitation and that upon completing the drug program he would not constitute a menace to society.
The State thereafter moved for a reconsideration of the motion. This was denied by the trial judge, who transposed the application into a motion to augment the record to include defendant's statement regarding the crime and the transcript of his retraxit hearing for the purposes of this appeal. Defendant's motion to dismiss the State's appeal on the ground that the order was not appealable was denied.

I
First, we reject defendant's argument that the State may not appeal the trial judge's order of modification. That argument includes as a premise that "when a sentencing judge decides to vacate his original sentence and have a defendant transferred to a drug treatment center, he is in effect taking measures which are analogous to the reduction of the quantum of a defendant's sentence." We need not dwell on the accuracy of the claimed analogy. In this case the original sentence *297 was not vacated. It was permitted to "stand." Although the judge probably intended to sentence defendant to custody for the time already served, there is nevertheless some uncertainty as to the effect and enforceability of the revised sentence. Cf. State v. Braeunig, 122 N.J. Super. 319, 334 (App. Div. 1973). Moreover, the sentence is somewhat ambiguous in respect to the completion of the five-year probationary term.
We hold that modifications under R. 3:21-10(a), now R. 3:21-10(b), are appealable by the State. Defendant's principal argument on this issue is that
In none of the five categories of appealable judgments specified in paragraph (b) of [R. 2:3-1] is the State given the option of filing a direct appeal from a sentence imposed upon a defendant. In addition the motion for a change of custodial sentence was brought after sentencing and, therefore, after the judgment of conviction in this case was made final. Therefore, the entire proceeding at the trial level had been completed and the order cannot be characterized as interlocutory in nature and thus appealable under R. 2:3-1(b)5.
The argument does not persuade. R. 2:3-1 provides:

Appeal by the State in Criminal Actions
In any criminal action the State may appeal or, where appropriate, seek leave to appeal pursuant to R: 2:5-6(a):
a. * * *
b. to the appropriate appellate court from: (1) a judgment of the trial court entered before or after trial dismissing an indictment, accusation or complaint; (2) an order of the trial court entered before trial in accordance with R. 3:5 (search warrants); (3) a judgment of acquittal entered in accordance with R. 3:18-2 (judgment n.o.v.); (4) a judgment in a post-conviction proceeding collaterally attacking a conviction or sentence; (5) an interlocutory order entered before or after trial.
The modification order here challenged, especially in light of its uncertain meaning, might well be considered interlocutory in nature. It appears to contemplate or entail continued judicial intercession and superintendence.
There is no constitutional infirmity in permitting the State to appeal in such instances where important societal interests *298 are involved. In at least two situations the Double Jeopardy Clause of the Fifth Amendment does not bar appeals by the State: (1) where the State initiates an appeal before jeopardy attaches, i.e., prior to the commencement of trial, and (2) where, as here, the State appeals a post-verdict ruling where there is no possibility that an appellate decision would require further proceedings to resolve fact issues involving the underlying crime. See, generally, "The State's Right to Appeal in Criminal Actions," 3 The Crim. Justice Q. 182 (1975). Indeed, it has been held that R. 2:3-1 appears to have intended to permit the State broad comprehensive review except for judgments of acquittal and interlocutory orders made in the course of a criminal trial. State v. Sheppard, 125 N.J. Super. 332, 338 (App. Div. 1972), certif. den. 64 N.J. 318 (1974).
We find no substantial merit to defendant's argument that the State's appeal is untimely. An appeal from the order under review is not precluded by our rule. We therefore consider the State's notice of appeal as a motion for leave to appeal and because of the special circumstances and the need to resolve the issue presented grant leave nunc pro tunc. Butler v. Buenaga, 107 N.J. Super. 80 (App. Div. 1969). Compare Frantzen v. Howard, 132 N.J. Super. 226 (App. Div. 1975).

II
The modification of sentence ordered here was entered prior to State v. Davis, 68 N.J. 69 (1975). There defendant appealed the denial by the trial court of his motion to be transferred to a methadone treatment program under R. 3:21-10. As here, there was a recommendation by a member of the program's personnel that Davis be entered in the program. Davis noted that while it is the public policy of this State to provide drug addicts with rehabilitatory programs, defendant there had failed to show "present addiction." Davis had apparently been drug free during four years of imprisonment but persisted in a claim of present addiction.
*299 In Davis the Supreme Court remanded the matter to the trial court for a factual determination on the issue of addiction, observing that by way of an expanded record it had before it a psychiatric evaluation report which included a prognosis of heroin addiction. The court was quick to add, however, that present addiction (and we presume a recommendation for transfer from custody) does not end the inquiry. The ultimate issue is whether the purposes for which the custodial sentence * * * might reasonably be continued outweigh the interests sought to be served by transfer to a narcotics treatment center. (At 82). The court concluded that if there was no substantial change in the record on the issue of addiction, then there would be no need to change the custodial sentence. The court reiterated that "even should addiction be found, that does not mean ipso facto defendant is to be transferred."
The exercise of discretion in these matters requires painstaking inquiry and analysis. The formulation of inflexible or automatic rules to assist in deciding all cases is neither easy nor desirable. Public policy in this area addresses two competing demands: (1) society's interest in the rehabilitation of drug addicts serving custodial sentences, and (2) its interest in protecting its members and property from criminal activity through the enforcement of its laws, including the imposition of legislative sanctions designed to fit both the offender and the offense.
In treating of motions brought, trial judges, in utilizing their discretion under R. 3:21-10(b), should, of course, first consider the two Davis criteria: (1) Is there present addiction? and (2) If so, do the purposes for continued custody outweigh the interests sought to be served by a transfer for treatment? Many factors might be involved in resolving the latter issue including (a) the involved crime, its seriousness and attendant circumstances; (b) defendant's prior record  criminal and addictive; (c) potential threat posed to society by defendant's release; (d) the bona fides of the application; (e) the likelihood or probability of successful *300 treatment; (f) prior treatment record, and (g) the failure or success of prior treatment.
In the instant matter we first observe there was no meaningfully clear showing of present addiction. Dr. Freymuth's report does not, as we read it, bespeak any. Certainly, defendant's own ambivalent statements fall short of the mark. In any event, even if we were satisfied that defendant was truly addicted at the time of the hearing, the totality of the record would foreclose transfer.
We deal here with a senseless and brutal killing by a man with a not unsubstantial criminal record, dating back to at least 1961. At the time of his confession, plea retraction and sentence it does not appear that he even sought to mitigate the crime by urging a diminution of his will by drugs or alcohol. He made no claim to this end at his interview with the Probation Department during the preparation of the presentence report. He had been a participant in three different drug programs prior to this crime. If we were to believe his lately stated claim that he was under the influence of cocaine when he killed Sellers, we must perforce question the efficacy of the prior treatment experiences.
On this record we hold that even assuming present addiction, society's interest in defendant's continued custody far outweighs any interests sought to be served by the transfer of defendant to a treatment program. Defendant's plea to the murder indictment was knowingly and voluntarily entered with the assistance of counsel. There was a full understanding of the plea bargain and the custodial sentence to which defendant was exposed. Indeed, the sentence was less in its terms than that recommended by the prosecution. We are satisfied that the dramatic modification ordered was not warranted on the record and enhanced the probability that it would depreciate the magnitude of the crime and diminish the deterrent effect of the original sentence on others. State v. Sherwin, 127 N.J. Super. 370, 380 (App. Div. 1974), certif. den. 65 N.J. 569 (1974); State v. Ivan, 33 N.J. 197 (1960).
*301 Lastly, the State implicitly argues that where motions for transfer are made long after the commencement of a custodial term, granting them under the rule amounts to an intrusion upon the statutory functioning of the New Jersey Parole Board. Hypothetically, such a motion might be made and granted after a denial of parole. We are not the proper forum, nor is this record the proper vehicle, for such a determination. We observe, however, that R. 3:21-10(a), now R. 3:21-10(b), allows such motions to be made "at any time."
The order under review is reversed.