608 A.2d 341

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v. COLLEEN
F. CANNON, A/K/A KOLLEEN KANNON, DEFENDANT–
RESPONDENT.

Argued January 2, 1991—Decided July 14, 1992.

*Steven F. Kaflowitz,* Special Deputy Attorney General, argued the cause for appellant (*Edmund J. Tucker,* Special Deputy Attorney General in Charge, Acting Union County Prosecutor, attorney).

*Mark H. Friedman,* Assistant Deputy Public Defender, argued the cause for respondent (*Wilfredo Caraballo,* Public Defender, attorney).

*Simon Louis Rosenbach,* Assistant Prosecutor, argued the cause for *amicus curiae* New Jersey Prosecutors' Association (*Alan A. Rockoff,* Middlesex County Prosecutor, attorney).

*Debra L. Stone,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

*Alan L. Zegas* submitted a brief on behalf of *amicus curiae* New Jersey Association of Criminal Defense Lawyers.

The opinion of the Court was delivered by

WILENTZ, C.J.

In this matter, the State, the Prosecutors' Association, and the Attorney General contend that the Intensive Supervision Program (ISP) is invalid as applied to first- and second-degree offenders. They assert that the Program conflicts with the legislative command that all such offenders must be imprisoned. We conclude that they are correct. We regret the conclusion because the Program has been an outstanding success in achieving its important goals: relieving prison overcrowding, and punishing and rehabilitating carefully selected offenders, and doing both with the utmost concern and care for the safety of the public. We hold that absent further confirming legislative approval, first- and second-degree offenders may not be admitted into the Program. Given the consistent long-term prior indications of legislative and executive support, however, we stay the effective date of our judgment until January 1, 1993, in order to give the Legislature the opportunity to enact the appropriate corrective legislation.

I

*Facts*

Colleen Cannon was a drug addict. To support her habit she stole over $100,000 by forging her employers' checks. She

pleaded guilty to various crimes, the only one at issue in this case being theft by deception, *N.J.S.A.* 2C:20–4, a second-degree crime since more than $75,000 was involved. *N.J.S.A.* 2C:20–2b(1)(a). Pursuant to a plea bargain she received the minimum sentence provided by statute—five years imprisonment. Her sentence commenced on May 5, 1989, with a projected parole eligibility date of approximately May of 1991. Having no prior record, she most likely would have been released at that time, after having served about a year in prison. Instead, after having served seven months in prison, she was admitted into ISP and released from prison on December 8, 1989.[1]

ISP, described in detail later, is a sentencing alternative that removes carefully selected defendants from prison and releases them into the community under standards of supervision so strict as to substantially eliminate any risk to public safety. The goals are reduction in prison overcrowding, appropriate punishment of the offender, and rehabilitation. Cannon remained under the strictures and supervision of ISP until October 4, 1991, when she was discharged from the Program and released by the Resentencing Panel, more than a year later than her probable parole release date.

The two-judge panel that admitted her into ISP, while expressing some doubt about her ability to complete the Program successfully, concluded that on balance her admission would serve its goals. Implicit in its reasoning was the conclusion that without ISP, defendant might revert to her drug habit with its adverse impact on her and on society, once released from prison.

The State appealed from Cannon's admission into the Program. The Appellate Division ultimately denied the State's application to stay that admission pending appeal; since Cannon has now successfully completed the Program and has served, in

---

[1]Some of the information concerning Cannon, not part of the record below, was furnished by the ISP.

the aggregate, more real time than called for under her original sentence (counting both time served in prison and time served with ISP, all parties agreeing she is entitled to full credit for that time against her prison sentence)[2], the outcome of our decision will have no practical impact on defendant. The issues are of great importance, however, and should be disposed of.

The basic issue is whether first- and second-degree offenders may be admitted into ISP. The issue tests this Court's power over sentencing alternatives. The State's position is that *N.J.S.A.* 2C:44–1d, requiring that all first- and second-degree offenders be sentenced to prison (except when "serious injustice" would result), is inconsistent with ISP and renders the Program invalid as applied to such offenders.[3] The State argues that this Court has no power through rule-making or otherwise to convert a mandatory prison term into probation, no matter how strict the supervision.

Sustaining the State's position would reduce, by 20%, participation in ISP. Indeed, the impact in the future may be even greater since the proportion of first- and second-degree offenders admitted into the Program has been growing. As of April 24, 1992, the Program has been successfully completed by 1,234 prisoners, about 20% of whom were first- and second-degree offenders. At that time there were an additional 625 released

---

[2]It is settled that ISP participants receive full credit for time served while in the Program. See Pressler, *Current N.J. Court Rules,* comment on *R.* 3:21–8 (1992); *State v. Reyes,* 207 *N.J.Super.* 126, 145 n. 8, 504 *A.*2d 43 (App.Div.)(ISP mandates credit for time served), *certif. denied,* 103 *N.J.* 499, 511 *A.*2d 671 (1986).

[3]The exception is not only inapplicable to this case but a irrelevant to ISP and, given this Court's interpretation of it available only in the rarest of cases. *See State v. Jarbath* 555 *A.*2d 559 (1989) (the "serious injustice" exception i should be applied only under circumstances that are 'truly ext unanticipated' ") (quoting State v. Roth, 95 N.J. *334(1984));* State v. Kent, 212 N.J.Super. *635,* 643, 515 *A.*2d 127 *rehabilitation program not sufficient basis to conclude that i would be "serious injustice"),* certif. denied, *107* N.J.(1986).

3The exception is not only inapplicable to this case but as a practical matter irrelevant to ISP and, given this Court's interpretation of it, an exception available only in the rarest of cases. *See State v. Jarbath,* 114 *N.J.* 394, 406–07, 555 *A.*2d 559 (1989) (the "serious injustice" exception is "extremely narrow: it should be applied only under circumstances that are 'truly extraordinary and unanticipated'") (quoting *State v. Roth,* 95, *N.J.* 334, 358, 471 *A.*2d 370 (1984)); *State v. Kent,* 212 *N.J.Super.* 635, 543, 515 *A.*2d 1275 (App.Div.) (success of drug rehabilitation program not sufficient basis to conclude that imprisonment would be "serious injustice"), *certif. denied,* 107 *N.J.* 65, 526 *A.*2d 149 (1986).

prisoners under the Program's supervision. It has been noted that the Program, with a constant population of over 400 defendants who would otherwise be in prison, has saved the State the expense of building at least one more prison; furthermore, its rehabilitative success is indicated in the recidivism rate of its graduates. *Administrative Office of the Courts, ISP Fact Sheet,* (May 15, 1992) (*Fact Sheet*). ISP graduates have a recidivism rate following graduation of 4.3% indictable convictions and 4.7% disorderly persons convictions, over an average period of more than four-and-one-half years for each. *Administrative Office of the Courts, New Jersey Intensive Supervision Program, Winter 1992 Progress Report* 2–5 (1992) (*Winter 1992 Progress Report*). The general prison population, on the other hand, has a 32.0% comparable recidivism rate for a period of three years following release. *Administrative Office of the Courts, 1980 Report* at 1. The recidivism rate for first- and second-degree ISP graduates is even lower: 1.1%. See *Fact Sheet, supra.*

The primary question before us is whether the mandate of *N.J.S.A.* 2C:44–1d, requiring imprisonment of all first- and second-degree offenders, prevails over the Court-approved ISP standards allowing their release into the community. Related to this question is the propriety of *Rule* 3:21–10(e), which prohibits appeal from the judicial decision admitting defendants into the Program. Finally, we must determine whether ISP is the functional and legal equivalent of the "imprisonment" mandated by the statute. In order to address these questions, we shall first describe the Program.

## II

### *The Program*

ISP is a Court-initiated sentencing alternative designed by the Administrative Office of the Courts (AOC) in the early 1980s. It was developed in consultation with the Executive branch and implemented after Executive approval. See *Office*

*of the Governor, Prison Overcrowding: A Plan of Action* 9–
10 (1982) (*Prison Overcrowding* ). Since its inception in 1983, it
has been funded, every year thereafter, by a special-purpose
appropriation in the budget submitted by the Governor and
approved by the Legislature, entitled simply "Intensive supervi-
sion program." See, *e.g.*, *L.* 1985, *c.* 209 at 782. In the budget
for fiscal year 1993 that appropriation would be dramatically
increased from $3,584,000 for fiscal year 1992 to $8,414,000
($5,847,000 for basic ISP, and $2,567,000 for a new juvenile ISP)
for fiscal year 1993. 1993 New Jersey Budget, S1000 [1R] § 98
(1992).

ISP is a Program open only to those sentenced defendants
who have served prison time. Defendants accepted into the
Program have served an average of about six months. The
premise of the Program is that a very limited number of
carefully selected defendants, having experienced prison, can
be safely released into the community prior to completing their
imprisonment term if they are subjected to the strictest supervi-
sion. Generally, only non-violent State-sentenced prisoners are
accepted. A defendant is not eligible if sentenced to a statuto-
rily mandated period of parole ineligibility. *See State v. Men-
del,* 212 *N.J.Super.* 110, 113–14, 514 *A.*2d 67 (App.Div.1986).

ISP is administered by the AOC through specially selected
probation officers and other professional staff. The ISP appli-
cation and admission process is rigorous, and an applicant may
be rejected at any point. The initial step makes ineligible any
applicant who is currently incarcerated for homicide, robbery, a
sex offense, or whose sentence includes a mandatory period of
parole ineligibility. The second step screens out all applicants
whose offense was of the first- or second-degree or included an
act of violence, unless the Screening Board determines that,
nonetheless, the offense does not preclude eligibility in the
Program. The applicant is interviewed by an ISP officer, who
also helps form a case plan with specific goals and means of
reaching those goals. The applicant must have community
sponsors who are willing and able to assist him or her. The

case plan is signed by both the applicant and the community sponsors. The third step consists of the acquisition by the ISP staff of any and all necessary documents and information. In the fourth step, all of the applicant's information, including recommendations from the sentencing judge, other officials, and any victims, is reviewed by an ISP Screening Board. A Board is made up of three members, one a citizen appointed by the Chief Justice, one from the Department of Corrections, and one an ISP representative. A Board must determine the suitability of the applicant based on the offense, his or her background, and the efficacy of the plan. A Board may reject the applicant, with no right of appeal, or may initiate the fifth step, which is a personal interview in order to better determine whether the applicant is worthy. If deemed worthy, the applicant moves to the sixth step which is a review by the Resentencing Panel, which consists of judges appointed by the Chief Justice. The Panel reviews the information and holds an eligibility hearing open to all interested persons.

If rejected, the applicant remains incarcerated. If approved, the applicant begins a ninety-day probationary period, after which another hearing may be held. If successful, the applicant enters a second ninety-day probationary period, followed, if necessary, by a further hearing before the Panel. After successful completion of the second probationary period, the applicant enters the Program. Once accepted, the participant is continually monitored and must periodically appear before the Panel. See *Winter 1992 Progress Report, supra,* at 2–5; *Administrative Office of the Courts, Intensive Supervision Program* 10–15 (1983) (*1983 Report*).

The difficulty in obtaining admission is indicated by the fact that of 16,260 applications, only 2,899 have been admitted. *Intensive Supervision Program, 1st and 2nd Degree Instant Offense Report* (May 1992). In other words, since its inception in 1983 about 83% of all applicants have been rejected. The stringency of the conditions is further indicated by the fact that of the participants admitted to the Program, fewer than half

have been able to successfully complete it. All of those unable to graduate from the Program are returned to custody.

In the steps leading to approval or rejection, the panel of judges reviews the material collected by staff during the approval process and conducts a plenary hearing at which all aspects of the proposed entry into the Program are examined. The judges hear from the defendant and his or her family, from those people in the community who constitute the support group, from the victim, from the prosecutor, from potential employers, from the ISP staff, from those familiar with the defendant's background and past history, and from others. The standard applied is a blend of factors, the foremost being the safety of the community, and thereafter the amenability of the defendant to rehabilitation, and the likelihood of achieving such rehabilitation in view of the efforts of the Program, the participant, and the community support network. Weighed in the balance is the motivation of the defendant, the strength of his or her desire for rehabilitation, the strength of the community support group, and all other conditions bearing on the likelihood of success of the applicant. As noted earlier, any approval is conditional, and the applicant is subject to two ninety-day probationary periods prior to formal entry into the Program. Appeals are not permitted.[4]  *R.* 3:21–10(e).

While the conditions and restrictions of ISP are tailored to fit the needs of each individual case, they are invariably strict and onerous. All participants must be employed full time, submit to urine monitoring for alcohol and illegal substance use; maintain a nightly curfew which is monitored by ISP officers; perform community service; make regular payments toward fines, restitution, penalties, support of dependents, and the cost

---

[4]Prior to this appeal, the Division of Criminal Justice and the Prosecutors' Association unsuccessfully attempted to persuade the Supreme Court Committee on Criminal Practice that *Rule* 3:21–10(e) should be amended to permit appeals from ISP determinations. See *Report of the Committee on Criminal Practice,* 125 *N.J.L.J.* 385, 415 (1990).

of being supervised in the Program; actively participate in treatment programs, and keep a daily diary and weekly budget of all income and expenses. They may not collect welfare assistance, unemployment insurance benefits, or lend or borrow money.[5]

In Cannon's case, during her twenty-two months of ISP she had a total of 1,425 contacts with her ISP officer of which 355 were curfew checks. She experienced no curfew violations during the Program. She completed 339 hours of community service, was administered 190 drug screens, and was employed on a full-time basis. She paid a Violent Crimes Compensation Board penalty of $90 and $3,616 towards her restitution obligation. She apparently successfully dealt with her cocaine addiction. She was placed in an in-patient residential treatment program in 1990 and after a successful discharge from that program actively participated in a total program of recovery. She experienced some difficulties, however, within the Program. As a result of two violations she was assessed sixteen additional hours of community service, had her curfew reduced to 6:00 p.m., the Program was extended for one month beyond her normal period, and she was required to appear before the resentencing panel for a ninety-day review. Since her discharge from the Program she has remained in contact with ISP, serving as a network-team member for another participant. She remains steadily employed and continues to make restitution payments of $200 per month to the victims as stipulated in her consent agreement.

The Program lists as its accomplishments an employment rate exceeding 96%, over $41 million in participant earnings, more than $3.3 million paid in court required payments, and

---

[5]The program of electronic monitoring of early parolees by the Department of Corrections appears to differ significantly from ISP. The crucial difference is the constant, intensive, pervasive, and strict supervision of those admitted into ISP, including their compliance with conditions designed to assure public safety.

over 520,000 hours of community service completed. See *Fact Sheet, supra.*

Obviously, the overall record of the success of this Program has been dramatic.[6] And that success cuts across all defendants, regardless of the degree of their crime, for as noted above the recidivism rate for first- and second-degree offenders has been even lower than the average recidivism rate. There are some who, having learned of the strictness of the Program, withdraw their application; there are many who stay in the Program despite the fact that the period of its intensive supervision often extends well beyond their probable parole date; and there are those who remain in the Program despite the knowledge that if they violate the conditions and are returned to custody, they will have suffered a "hit," for such return will have the effect of extending what would otherwise be their initial parole eligibility date. The New Jersey Supreme Court 1991 Judicial Conference on Sanctioning and Probation (see *Report of the Committee on Sanctioning* 10–11 (March 1992)) and the Court's 1990 Judicial Conference on Drugs and the Courts (see *Final Report, Task Force on Drugs and the Courts* 57–58) both strongly endorsed ISP and recommended its expansion, as did the *Report of the Special Committee to Assess Criminal Division Needs* 23–24 (January 31, 1990); the Governor and Legislature have regularly supported it through appropriations; and several counties have obtained Court approval for, and are implementing, county ISPs. It is fair to say

---

[6]On June 8, 1992, the Program was presented with an award by the National Center for Public Productivity of the Rutgers University Graduate Department of Public Administration, which noted that the Program "is one of only 25 programs nationally which are being recognized as having produced exceptional cost savings, measurable increases in quality and productivity, and improvements in the quality and effectiveness of government services." *Administrative Office of the Courts, Press Release* (June 2, 1992). The Program annually costs approximately $6,300 per participant, and when employment and community service is factored in, the net cost becomes only $3,660 per participant. See *Winter 1992 Progress Report, supra,* at 6. In contrast, it costs the State approximately $25,000 per year to incarcerate a single inmate. *Ibid.*

that but for *N.J.S.A.* 2C:44–1d (and its procedural companion 1(f)(2)) this Court would continue the Program.

## III

### *Preliminary Issues*

The following constitutional, statutory, and Rule provisions are relied on by the parties and *amici.* First, defendant cites this Court's constitutional powers to make rules governing the administration of justice and the practice and procedure in the courts (*N.J. Const.* art. VI, § 2, ¶ 3), in support of her claim that both ISP and the court Rules implementing it, including the Rule prohibiting appeals from the resentencing panel's decision to admit defendants into ISP, have an invulnerable constitutional basis. The State points to the constitutional right to appeal judgments of the Law Division to the Appellate Division (*N.J. Const.* art. VI, § 5, ¶ 2) in support of its contention, subject to double jeopardy concerns, that the State has a constitutional right to appeal judicial determinations admitting applicants into the Program and that such constitutional right to appeal prevails over the court Rule prohibiting it. The State also cites the statutory provisions requiring imprisonment of first- and second-degree offenders [7] and allowing appeal by the State from any nonconforming sentence (*N.J.S.A.* 2C:44–1d, and 1(f)(2)), in support of its claim that the legislative power to prescribe punishment, having been exercised, prevails over any inconsistent court program or Rule, and that the right to appeal

---

[7] It is clear that despite the title of *N.J.S.A.* 2C:44–1d, "Presumption of imprisonment," the statute *requires* the imprisonment of all first- and second-degree offenders absent "serious injustice." When there is a discrepancy between the title and the plain words of a statute, the plain words control. *See Cameron & Cameron Inc. v. Planning Bd.,* 250 *N.J.Super.* 296, 302, 593 *A.*2d 1250 (App.Div.1991) (citing *City of Atlantic City v. County of Atlantic,* 193 *N.J.Super.* 583, 586, 475 *A.*2d 616 (App.Div.1984)); *Swede v. City ofClifton,* 39 *N.J.Super.* 366, 377–78, 121 *A.*2d 43 (App.Div.), *aff'd,* 22 *N.J.* 303, 125*A.*2d 865 (1956); N. Singer, 2A *Sutherlands Statutory Construction* § 47.03 at 121 (4th ed. 1984).

is substantive, not subject to this Court's power over practice and procedure. Finally, defendant points to the court Rules allowing modification of sentence through admission to ISP but prohibiting appeals (*Rule* 3:21–10b(5) and 10e) in support of her claim that the constitutionally based Rules provide for ISP admissions and protect them from further judicial review.

The legal issues, as noted in the prior paragraph, have been posed in many forms. Since the court Rule (*Rule* 3:21–10e) prohibits appeals from ISP decisions, the case initially focused on the State's alleged right to appeal defendant's admission into the Program versus the power of the Court to foreclose such an appeal. In that form the question was whether the State had a constitutional right to appeal a sentence or its modification under *Rule* 3:21–10, absent double jeopardy concerns, or whether, on the other hand, the Court's constitutional power over practice and procedure took precedence, assuming the right to appeal fell within the purview of "practice and procedure." The constitutional confrontation took place after the Clerk of the Appellate Division refused to accept the State's notice of appeal, since it was in conflict with *Rule* 3:21–10e, and then when defendant moved to dismiss the State's later notice of motion for leave to appeal. In addition to asserting a constitutional right to appeal, the State argued that *N.J.S.A.* 2C:44–1(f)(2) explicitly provides a statutory right to appeal any sentence of non-incarceration or probation of first- or second-degree offenders. Finally, the State now asserts that *Rule* 3:21–10e unconstitutionally deprives *defendants* of the right to appeal ISP determinations.

Defendant responds that *Rule* 3:21–10e is a valid exercise of the Court's overriding constitutional right to govern practice and procedure in the courts, including the right to restrict appeals from such a modification of sentences.

We need not, and do not, decide these issues as posed by the parties. Some deal with the question of whether the Program, assuming it is beyond this Court's power, can nevertheless

remain in place by virtue of this Court's alleged power to foreclose appeals by adopting Rules concerning "practice and procedure." Even assuming such a power, we doubt that this Court would ever shield a claim of judicial usurpation of power by resort to some other valid power. The underlying, essential claim before us is that this Court does not have the power, through ISP, to sentence first- and second-degree offenders to probationary terms in the face of the Program's alleged inconsistency with a punishment mandated by the Legislature. We shall address that claim.

## IV

### *Validity of ISP as Applied to First- and Second-Degree Offenders*

■ The challenge to ISP, according to both the State, represented by the prosecutor, and the Attorney General as *amicus*, relates only to its application to first- and second-degree crimes. In particular there is no challenge to the Court's power to provide such a Program as a sentence-modification mechanism, nor any direct challenge to the Court's power to foreclose appeals from modification of sentences other than for first- and second-degree crimes, although some of the arguments made by the State could apply to that Rule provision. We shall therefore limit the issue as framed by the parties: the validity of ISP and the Rules implementing it only as applied to first- and second-degree offenders.

Resolution of the challenge requires identifying the source of the Court's power to adopt ISP and the source of the Legislature's power to adopt *N.J.S.A.* 2C:44–1d and 1(f)2, allegedly in conflict with ISP. Since we have concluded, see section V, *infra* at 565–571, 608 *A*.2d at 350–353, that the Program and the statute *are* in conflict, we must decide which prevails.

■ We will first examine the source of the judiciary's power. The judiciary does not determine the punishment for

crimes. That is up to the Legislature. *See, e.g., State v. Tate*, 102 *N.J.* 64, 69, 505 *A.*2d 941 (1986). There is no law, no constitutional provision, that explicitly so provides, it is simply one of the most basic understandings of the allocation of governmental powers among the three branches. The Legislature and the Executive do not decide cases—even though the Constitution does not say so; the judiciary does not pass laws. One of the categories of legislation that the judiciary has no power to adopt is that defining crimes and providing for their punishment. If this Court adopted a rule purporting to make it a crime to drive a car on Sundays, that rule would be beyond our power; and if we said that the crime of theft by deception involving more than $75,000 (*N.J.S.A.* 2C:20–4 and 20–2b(1)(a)) was a crime of the fourth degree instead of a crime of the second-degree as provided for by the Legislature, that too would be beyond our power. Although the simplicity of the examples may conceal potential complexities, they tell what the true issue of this case is: who controls punishment—the Legislature or the Court. There is no doubt about the answer.

The questions that are raised arise from the efforts of all branches—including the judiciary—to cope with increasing crime, overcrowded prisons, the cost of incarceration, crowded court calendars, and the rehabilitation of offenders, and to do so creatively. These efforts are reflected initially in the melange of punishments—"dispositions"—explicitly made available to the sentencing court by the Legislature in the Code of Criminal Justice. *N.J.S.A.* 2C:43–2. In addition to imprisonment pursuant to that Code, the court may sentence the offender to pay a fine or make restitution, may place the offender on probation including imprisonment for a term not to exceed 364 days as a condition thereof, or some combination of these punishments. *Ibid.* The court may also release the offender under supervision in the community or require performance of community-related service, sentence the offender to a half-way house or other residential facility in the community, or to

imprisonment at night or on weekends with liberty to work or to participate in training or educational programs. *Ibid.*

The judiciary's concern with the adequacy of the criminal justice system's ability to deal with offenders was reflected in our adoption of Pretrial Intervention (PTI), without legislative authorization, long before the Criminal Code became effective. See Pressler, *Current N.J. Court Rules, R.* 3:28 Note at 682 (1992). That program, diverting accused offenders from prosecution into programs similar to ISP, but not nearly as restrictive, was later adopted by the Legislature in the Code. See *N.J.S.A.* 2C:43–12 and –13. While strictly speaking PTI is not a judicial intrusion into the punishment power of the Legislature, since it inevitably admits applicants into the program *prior* to sentencing, it clearly and substantially affected the disposition of alleged offenders without explicit legislative authority.

When constitutionally challenged, PTI was defended, successfully, as an assertion of the judiciary's power over practice and procedure, the challenge in that case based on the assertion that the judiciary had improperly invaded the prerogatives of the Executive branch, in particular the prerogatives of prosecutors to either pursue or abandon prosecution. See *State v. Leonardis,* 73 *N.J.* 360, 374, 375 *A.*2d 607 (1977) (*Leonardis* II); *State v. Leonardis,* 71 *N.J.* 85, 108–10, 363 *A.*2d 321 (1976) (*Leonardis* I). The basis for the "practice and procedure" ruling—a unanimous ruling—was both the overwhelming impact of increasing criminal prosecutions on judicial resources, as well as the traditional judicial power, limited as it might be, to review the actions of prosecutors. *Leonardis* I, *supra,* 71 *N.J.* at 93–98, 363 *A.*2d 321. The justification included the observation that the program, in effect, added to the options available to prosecutors. Of some importance was our recognition that to the extent there was a goal involved in PTI of rehabilitating offenders, that was clearly a legislative function. *Leonardis* II, *supra,* 73 *N.J.* at 369, 375 *A.*2d 607.

Today, even with the panoply of dispositions explicitly set forth in the Code, including PTI, judicial innovation still occurs. Combining various legislatively authorized dispositional alternatives, we have a Sheriff's Legal Assistance Program, in which inmates in county jails are given credit for time spent performing various tasks to improve county property, or to do other work for the benefit of the county, the program including those incarcerated by municipal courts and providing a multitude of innovative procedures assuring compliance with the program.[8]

The parties do not attack ISP itself as posing any separation-of-powers problem. They presumably deem it authorized by the courts' inherent and historical power to modify a sentence, *State v. Des Marets*, 92 *N.J.* 62, 80, 455 *A.*2d 1074 (1983), provided the modification itself is legal (*R.* 3:21–10) along with the statutory authority to sentence a defendant initially to probation, to release defendant under supervision in the community, and to require defendant to perform community related service. *N.J.S.A.* 2C:43–2b(2) and (5). But for *N.J.S.A.* 2C:44–1d, there clearly would be no case, both the Prosecutors' Association and the Attorney General as *amicus* conceding the Court's underlying power, even if questioning the foreclosure of appeals.

The point here, however, is that ISP is without doubt a sentencing disposition, albeit a modification of sentence, not an exercise of our power to make rules governing the administration of justice or of the practice and procedure in the courts. *But cf. State v. Abbati*, 99 *N.J.* 418, 433, 493 *A.*2d 513 (1985) (in *dicta*, indicating that ISP falls within Court's administrative powers). It deals with the essence of punishment, it deals with

---

[8]More recently, at this Court's 1991 Judicial Conference on Sanctioning and Probation, a dispositional alternative somewhere between ordinary probation and ISP was proposed, providing as an additional critical element active community involvement with the inmate or prisoner, involvement that includes community participation in the decision to admit, the design of the conditions of supervision, and the actual supervision itself.

what happens to offenders after they are convicted. It is a sentence, it *is* punishment. See *State v. Clay*, 230 *N.J.Super.* 509, 514, 553 *A.*2d 1356 (App.Div.1989), *aff'd o.b.*, 118 *N.J.* 251, 571 *A.*2d 295 (1990). That it is a modification of sentence makes no difference, for in effect the original sentence is vacated and a new sentence imposed, the new sentence being ISP. See *Winter 1992 Progress Report, supra,* at 6. Whether based solely on the authorization of statute, or, in absence of any statute and not in conflict therewith, on some notion of inherent judicial power, ISP clearly falls within that area over which the Legislature has close to total power: the power to punish, to deter, to rehabilitate, including the power to restrict any variations on the methods and options available for those purposes.[9] We need not decide the outer limits of that power, including its ability to restrict judicial initiatives like ISP, but certainly at the very least it includes the power to mandate imprisonment for certain crimes, leaving no judicial discretion. See *State v. Des Marets, supra,* 92 *N.J.* at 80–81, 455 *A.*2d 1074.

Having decided that the source of our power to create ISP is based either on statute or is inherent—and *not* constitutional—and having assumed it conflicts with *N.J.S.A.* 2C:44–1d, the conclusion is inescapable that as to first- and second-degree offenses, the enactment of ISP exceeds our power since it conflicts with a valid exercise of legislative power to determine the punishment that fits the crime.

That *N.J.S.A.* 2C:44–1d falls squarely within the legislative power is not debated, and seems beyond debate. Presumably, the Legislature could, as it did with the Graves Act, *N.J.S.A.* 2C:43–6c, and with various laws concerning drugs, *e.g., N.J.S.A.* 2C:43–6f, mandate imprisonment, without exception, for all

---

[9]We do not suggest that this Court lacks all power to fashion custodial alternatives for appropriate types of cases without the authorization of the Legislature. All that we decide here is that where the Legislature has mandated imprisonment, this Court may not, as an "alternative," order release.

first- and second-degree offenders, imprisonment for terms in the case of first-degree offenders between ten and twenty years and for second-degree offenders between five and ten years. But it has in fact imposed just such a mandate with but one exception, when "serious injustice" would result from such imprisonment. The only relevance to ISP of the exception is the strong inference that having so drastically limited the exception to imprisonment—for our decisions construing the exception have underlined the rarity of its application—the Legislature, at the time it adopted the Code, did not intend to allow a much broader exception in the form of ISP.

V

*Conflict between ISP and N.J.S.A. 2C:44–1d and 1f(2)*

■ We have thus far assumed that ISP conflicts with *N.J.S.A.* 2C:44–1d and *N.J.S.A.* 2C:44–1f(2). The Public Defender says it does not. In determining whether there is such a conflict, we shall deal with *N.J.S.A.* 2C:44–1d as if there were no exception. We do so for two reasons: first, given our construction of that exception in prior cases, *e.g. State v. Jarbath*, 114 *N.J.* 394, 555 *A.*2d 559 (1989), only the rare case will fit the exception; second, given the standards applied to the Program, admission does not depend in the least on a finding of "serious injustice"; conformance with that standard in admission to ISP, if it ever occurs, would be strictly coincidental. ISP looks to rehabilitation compatible with the safety of the community, not to whether imprisonment constitutes "serious injustice." We note further that any case falling within the exception should not have resulted in imprisonment in the first place, a requisite for ISP eligibility, and further that this defendant does not fit within the exception. Finally, if any case out of the approximately 2900 admissions into the Program happened to fit the "serious injustice" standard, all that it would prove is that the conflict between ISP and the statute is not absolute or inevitable.

As a practical matter, as ISP operates, practically every person admitted into the Program guilty of first- or second-degree crimes falls within the mandate of *N.J.S.A.* 2C:44–1d; as a practical matter, the number of admittees, if any, who fit within the exception, are so few that we shall treat the matter as if there are none. Put differently, the State attacks the Program as applied to first- and second-degree offenders on the premise that the Program totally rejects the "serious injustice" standard in determining admissions; the Public Defender makes no claim to the contrary.

The Public Defender and *amicus* the Association of Criminal Defense Lawyers, argue that there is no conflict, that ISP falls somewhere between imprisonment and probation, that it is more akin to the former and therefore not in conflict with the statute. Furthermore, they argue, since ISP did not exist when the Code, including *N.J.S.A.* 2C:44–1d, was enacted, the Legislature could not have intended to prohibit the Program, and more than that, subsequent action in the form of supporting appropriations amounts to legislative approval. The latter point amounts to an argument, assuming a conflict when ISP was initially adopted by this Court, that subsequent appropriation action of the Executive and Legislative branches amounts to an amendment of *N.J.S.A.* 2C:44–1d by implication, carving out a further exception to this section.

The legislative mandate requires a sentence of imprisonment for all first- and second-degree offenders, and certainly ISP does not conform to that. Although it is true that every ISP applicant must be imprisoned in order to be eligible for the Program, it seems clear that by "imprisonment" the Legislature meant not simply the imposition of a sentence of imprisonment but service of the statutory sentence, conforming to the statutory mandate. *See, e.g., State v. Roth,* 95 *N.J.* 334, 357–58, 471 *A.*2d 370 (1984) (interpreting "presumption of imprisonment" under *N.J.S.A.* 2C:44–1d); *see also State v. Johnson,* 118 *N.J.* 10, 15, 570 *A.*2d 395 (1990); *State v. Jabbour,* 118 *N.J.* 1, 7, 570 *A.*2d 391 (1990); *State v. Hodge,* 95 *N.J.* 369, 471 *A.*2d 389

(1984). The Legislature did not mean, for example, that to comply with the *N.J.S.A.* 2C:44–1d statutory mandate a court could sentence a defendant to twenty years imprisonment and release him the next day into the community under ISP.[10] The fact that on the average ISP admittees spend six months in prison does not render the Program in conformance with *N.J.S.A.* 2C:44–1d; six months "on the average" is not what the Legislature meant, it meant serving a term, in accordance with the statutes, either between ten and twenty years or between five and ten years, for everyone, not "on the average." The Public Defender notes the fact that many defendants are released, without ISP, long before their full term is up, by virtue of the parole statutes. Such release, however, is precisely what the Legislature intended. See *N.J.S.A.* 30:4–123.51. The *N.J.S.A.* 2C:44–1d mandate of sentence of imprisonment was undoubtedly intended by the Legislature to include the potential of release under parole provisions. That intent is a far cry from attributing to the Legislature, at the time of the adoption of the Code, an alleged similar intent to allow other, nonstatutory, forms of release.

If the argument is that because the Legislature contemplated parole, it therefore sanctioned ISP as the equivalent of imprisonment since it somehow resembles parole, the answer is that the resemblance falls far short of suggesting such legislative intent. The minimum imprisonment for a first-degree offense is ten years, with real time likely to be over two years; the average ISP prison time is but six months. And if real time for all first- and second-degree offenders were averaged, we assume it would exceed the ISP average even more. The Legislature need not explicitly amend a statute like *N.J.S.A.* 2C:44–1d

---

[10]Nor did it mean to allow a court to circumvent the mandate of *N.J.S.A.* 2C:44–1d by resentencing a defendant who was convicted of a first- or second-degree crime from a term of incarceration to a term of probation or mandatory rehabilitation. *See State v. Kent,* 212 *N.J.Super.* 635, 642–43, 515 *A.*2d 1275 (App.Div.), *certif. denied,* 107 *N.J.* 65, 526 *A.*2d 149 (1986).

every time some other branch of government takes action inconsistent with it in order to avoid the implication that the Legislature concurs.

Defendant's argument relies more on *N.J.S.A.* 2C:44–1f(2), the appeal provision, than on *N.J.S.A.* 2C:44–1d itself. The former section allows the prosecutor to appeal from any sentence of first- or second-degree offenders that is "noncustodial or probationary," the language varying somewhat from the *N.J.S.A.* 2C:44–1d mandate of imposing a term of "imprisonment." Defendant, noting our language in a different context in *State v. Abbati, supra,* 99 *N.J.* at 433, 493 *A.*2d 513, argues that ISP is not probation, but, as we there said, "lies somewhere between incarceration and probation." The argument fails. Literally, if ISP is *not* incarceration, then it is, as the statute says, "noncustodial" even if it is not probation. *See State v. Clay, supra,* 230 *N.J.Super.* at 509–27, 553 *A.*2d 1356 (penal consequences of ISP under the escape-law statute considered to be "noncustodial").[11] Furthermore, while there is no legislative history on the issue, it seems apparent that in using the language of *N.J.S.A.* 2C:44–1f(2), the Legislature simply wanted to make it clear that when it said "imprisonment," it meant imprisonment in fact, that its mandate could not be effected by any means short of incarceration, that suspended sentences, or probation of any kind would not conform to the mandate, and in that respect *N.J.S.A.* 2C:44–1f(2) was simply aimed at tightening the requirements of *N.J.S.A.* 2C:44–1d. In terms of *N.J.S.A.* 2C:44–1d and *N.J.S.A.* 2C:44–1f(2), ISP is probation, albeit a very different form of probation.

The provisions allowing prosecutorial appeal, therefore, do nothing to diminish the conflict; indeed, they emphasize it.

---

[11] We note, however, that subsequent to *Abbati* the Legislature amended *N.J.S.A.* 2C:29–5b by *L.*1991, *c.* 34, § 1, to make those "absconding" from ISP subject to prosecution for the crime of escape.

## VI

### *Conformance of ISP with Present Legislative Intent*

■ Having concluded that ISP's treatment of first- and second-degree offenders is inconsistent with the legislative intent at the time of the adoption of the Code, we must determine the legal effect of the Legislature's subsequent support of the Program through the appropriations process.

We have in other contexts read legislative intent through appropriation actions that sometimes speak louder than words. *Cf. City of Camden v. Byrne,* 82 *N.J.* 133, 154, 411 *A.*2d 462 (1980) (finding that Legislature's refusal to appropriate funds indicated intent to negate corresponding statute); *see also In re Boyan,* 127 *N.J.* 266, 268, 604 *A.*2d 98 (1992) (explaining that language of Appropriations Act can express legislative intent); *Schneider v. City of East Orange,* 196 *N.J.Super.* 587, 592–93, 483 *A.*2d 839 (App.Div.1984) (noting that legislative intent can be gleaned from statement of appropriations committee), *aff'd o.b.,* 103 *N.J.* 115, 510 *A.*2d 1118, *cert. denied,* 479 *U.S.* 824, 107 *S.Ct.* 97, 93 *L.Ed.*2d 48 (1986); *Clark v. Degnan,* 163 *N.J.Super.* 344, 369, 394 *A.*2d 914 (Law Div.1978) (stating that "[a]n appropriation act, in addition to appropriating monies, also has some mandatory implications and reflects current policy and enactment of the Legislature with respect to preexisting statutory formulas"), *modified on other grounds,* 83 *N.J.* 393, 416 *A.*2d 816 (1980). Any argument that ISP as a Program violates legislative intent must confront this explicit legislative appropriations support.

Executive and legislative support of ISP has been so strong, consistent, and unambiguous as to make it fair to assume present legislative approval of the Program in its entirety. Indeed, if this support had been in conventional statutory form, we would conclude that it amounted to an implied amendment of *N.J.S.A.* 2C:44–1d to conform that statute to ISP.

The history is compelling. The Program was started by the judiciary only after it had received explicit prior executive and

legislative approval. Faced with a predicted problem of overwhelming prison-overcrowding—a prediction that was more than fulfilled—the executive and legislative branches adopted numerous remedies, including ISP. The executive approval of ISP came after extensive discussions. It came in the form of a public report explicitly recommending the Program (see *Prison Overcrowding, supra*), and thereafter in the form of a budget proposed by the Executive and submitted to the Legislature that recommended an appropriation to support the Program. Legislative approval of the program consisted of passage of the appropriation. These approvals and support were neither tangential or supplementary; they were of the essence, a *sine qua non*, for they provided all of the required funds.

From its very inception, the Program explicitly allowed admission of first- and second-degree offenders. While modified in other respects from time to time, this aspect of the program concerning first- and second-degree offenders has never changed and has been mentioned in the many public reports issued by the Program over the years. *See, e.g., Fact Sheet* at 1. Considerable controversy has surrounded this aspect of the Program, including opposition from the Prosecutors' Association. Despite that controversy it has continued to receive executive and legislative support providing substantially all of its funding through a one line appropriation entitled "Intensive supervision program." This support has come year after year, without interruption, for the past ten years.

We do not conclude from this history that the Legislature in fact was aware that first- and second-degree offenders were included, although we think such a conclusion would be fair, or that the Executive and Legislature focused on the conflict between *N.J.S.A.* 2C:44–1d and the Program as it applies to first- and second-degree offenders. What we do conclude, and we believe the conclusion is inescapable, is that the Executive and Legislature approved of the Program as a whole, in toto, and intended to authorize its continuance as it then existed,

each year, whatever its problems, whatever the controversies, just as it was then being administered.

ISP from the outset received substantial public attention and considerable publicity. Not long after its implementation there was public approval that grew year after year, leading to the present situation in which not only have several counties, with Court approval, adopted their own county ISP, but the State itself has provided a substantial increase in the Program and its extension to a new juvenile ISP. *See* 1993 New Jersey Budget, *supra.* Given the public controversy and the continuation of the Program despite that controversy, given this record of success accompanied by substantial public acclaim and recognition, and given the consistent ten-year support of the Program by the Executive and the Legislature, we are led to a bottom line conclusion that is almost irresistible: the Legislature's intention reflected in the Code as amended in 1981 has evolved and changed into total approval of ISP, including those aspects of the Program that are inconsistent with the Code's provisions.

Ordinarily, such a conclusion would warrant the further conclusion that those provisions of *N.J.S.A.* 2C:44–1d inconsistent with ISP have been impliedly repealed. We decline so to conclude for two reasons. The first reason concerns the form of the Legislature's actions: appropriations rather than conventional statutory enactments; and the second reason concerns the nature of the subject matter: mandatory imprisonment. Concerning appropriations, although we have held that an appropriations bill can have the effect of superseding a statute by implication, *In re Boyan, supra,* 127 *N.J.* at 268, 604 *A.*2d 98, our conclusion there was premised on legislative language in the appropriations bill itself, language that explicitly expressed an intent that led to our conclusion. Here, despite similar clarity of intent, there is no language other than the appropriation line item itself. We are reluctant, despite this very strong evidence, to attribute to the Legislature an intent to approve each and every aspect of a program of the Executive or of the Judiciary, with the effect of an implied statutory amendment,

even given the continuous appropriations supporting that program. We do not say that such a course of action will never have that effect; it will depend on the circumstances involved. The obvious risk of so holding is to impose on the Legislature the obligation, whenever it appropriates funds in support of a program of the Executive or of the Judiciary, to search every detail, every possible legal implication, to make certain that its general support of the program does not have any unintended specific consequences, especially unintended implied repeal of existing statutory enactments.

These considerations are reinforced by the nature of the statutory provisions that would be affected: mandatory imprisonment. The provision involved in this case—*N.J.S.A.* 2C:44–1d—is central to the legislative intent of bringing uniformity and consistency to punishment and, above all, of assuring severity and deterrence. First- and second-degree crimes are the most serious crimes of all. By requiring imprisonment the Legislature has, in effect, mandated uniformity and severity. We believe that it would be both unwise and inappropriate for the judiciary to dilute so important a mandate based solely on legislative appropriations, despite the inference of changed intent. *Cf. State v. Tate, supra,* 102 *N.J.* at 68–69, 505 *A.*2d 941 (explaining that New Jersey Penal Code represents a shifting of responsibility for the growth and modernization of the criminal law from the courts to the Legislature). This is a statutory provision of central importance incorporating legislative intent with unmistakable clarity at the time it was adopted. It should not be disturbed by anything other than legislation that is direct and explicit, despite the clarity of a differing present executive and legislative intent. Realistically such express legislation would be simply a confirmation or ratification of this previously indicated intent, but given the importance of the subject matter, it is essential.

We conclude that the Legislature, having initially decided to mandate imprisonment for all first- and second-degree offenders, has, over the past ten years, evidenced its intention to allow

a substitute: supervisory probation under ISP. We conclude that ISP and *N.J.S.A.* 2C:44–1d are nevertheless in conflict because that intention has been evidenced only through appropriations bills; that ISP, otherwise a valid Program within legislative authorization for sentencing, will be validated if, in addition to these appropriations bills, there is an appropriate statutory amendment that, in effect, ratifies the clear legislative intent expressed over this past decade.

## VII

### *Effective Date*

■ Having concluded that ISP, given its legislative endorsement through appropriations bills rather than conventional statutory amendment, impermissibly allows first- and second-degree offenders to be sentenced outside of the constraints of *N.J.S.A.* 2C:44–1d, we would ordinarily prohibit such dispositions effective immediately. Executive and legislative support of the Program, however, is so strong as to warrant modification of that outcome. Although not sufficient to overcome the express provisions of *N.J.S.A.* 2C:44–1d, the actions of the other branches of government cause us to pause before abruptly eliminating so important a part of what they have so consistently supported.

■ It is our prerogative, in appropriate cases, to postpone the effective date of our decisions (suspended prospectivity) in order to accommodate governmental policy and expectations. See, *e.g., Madden v. Township of Delran,* 126 *N.J.* 591, 607, 601 *A.*2d 211 (1992); *Willis v. Department of Conservation and Economic Dev.,* 55 *N.J.* 534, 541, 264 *A.*2d 34 (1970); *State v. Rush,* 46 *N.J.* 399, 415, 217 *A.*2d 441 (1966). We believe that the substantial benefits of this Program in its present form and the practical certainty that events subsequent to the passage of *N.J.S.A.* 2C:44–1d have persuaded the Governor and Legislature to allow the Program to remain in effect are sufficient to warrant withholding immediate judgment. Judgment in this

13The State's right to appeal certain sentences, as authorized by Section 44–1f(2), does not violate Article I, paragraph 11 of the New Jersey Constitution (the double jeopardy clause). *See State v. Roth, supra,* 95 *N.J.* at 344–45, 471 *A.*2d 370. However, unless it has such explicit statutory authority, the State has no right to appeal in a criminal case. *State v. Watson,* 183 *N.J.Super.* 481, 483, 444 *A.*2d 603 (App.Div.), *certif. denied,* 91 *N.J.* 530, 453 *A.*2d 853 (1982), *cited in State v. Roth, supra,* 95 *N.J.* at 343, 471 *A.*2d 370. While we recognize

matter, therefore, shall not become effective until January 1, 1993. The Legislature may, in the interim, revise the statutes to confirm its intention, thereby allowing ISP to be applied to first- and second-degree offenses either as now implemented or in some other form. Absent any legislation, however, our judgment shall take effect on January 1, 1993.

## VIII

### *Miscellaneous*

We emphasize that we do not decide the question of the power of this Court to foreclose appeal in certain criminal matters, either by the State [12] or by the defendant; we do not pass on the claim that such power may exist as part of the constitutional right of this Court to govern practice and procedure, although it is obviously different from that adjudicated in *Winberry v. Salisbury,* 5 *N.J.* 240, 74 *A.*2d 406, *cert. denied,* 340 *U.S.* 877, 71 *S.Ct.* 123, 95 *L.Ed.* 638 (1950); we do not pass on the assertion of the State that it has a constitutional right to appeal all and any determinations in criminal cases absent double jeopardy concerns,[13] although we note our statements to

---

[12]In the past this Court has allowed the State to appeal in a number of circumstances including the modification of a sentence by court order, *State v. Williams,* 139 *N.J.Super.* 290, 353 *A.*2d 549 (App.Div.1976), *aff'd o.b.,* 75*N.J.* 1, 379 *A.*2d 233 (1977); the reduction of a sentence by the Resentencing Panel of the Superior Court, *State v. Johnson,* 176 *N.J.Super.* 1, 421 *A.*2d 1016 (App.Div. 1980), *remanded temporarily to Resentencing Panel,* 87 *N.J.* 335, 434 *A.*2d 83 *on remand,* 182 *N.J.Super.* 1, 439 *A.*2d 614 (App.Div.), *aff'd o.b.,* 88 *N.J.*26, 438 *A.*2d 519 (1981) (for reasons expressed by dissenting opinion of Judge Coleman, 182 *N.J.Super.* 1, 6–11, 439 *A.*2d 614); and an early parole release, *In re Hawley,* 98 *N.J.* 108, 484 *A.*2d 684 (1984).

[13]The State's right to appeal certain sentences, as authorized by Section 1f(2), does not violate Article I, paragraph 11 of the New Jersey Constitutio (the double jeopardy clause). *See State v. Roth, supra,* 95 *N.J.* at 3 *A.*2d 370. *However, unless it has such explicit statutory authority, the St has no right to appeal in a criminal case.* State v. Watson, *183* N.J.Su 483, 444 *A.*2d 603 (App.Div.), *certif. denied,* 91 *N.J.* 530, 453–853 *(1982),* cited in State v. Roth, supra, *95 N.J.* at 343, 471 A.2d 370. *Whilerecognize*

the contrary in *State v. Roth, supra,* 95 *N.J.* at 343, 471 *A.*2d 370.

Assuming the Legislature chooses to confirm its apparent present intent through statutory enactment, we note the considerations that led us to foreclose appeals from ISP determinations in *Rule* 3:21–10(e): the effectiveness of the Program will be impaired if admission is delayed pending the outcome of an appeal, and even if admission is not stayed, the pendency of an appeal may adversely affect defendants' performance in the Program. Assuming appeal by the State of admission of first- and second-degree offenders into the Program is permitted, the possibility—and we express no opinion concerning it—that such permission constitutionally triggers a right on the part of defendants to appeal denial of admission could impose an extremely heavy burden on the appellate courts. Without suggesting whether the Legislature does or does not have power to provide for any such appeals, we note that admission into probation, like any other sentence, is ordinarily unappealable by the State without express statutory authority. We further note that since *Jarbath, supra,* 114 *N.J.* at 394, 555 *A.*2d 559, the occasions on which the State has found pursuit of appeals necessary to correct what it perceives as sentencing errors under *N.J.S.A.* 2C:44–1d have been minimal, and that it is therefore likely, assuming the Legislature revises the standards for admission into ISP for first- and second-degree offenders, that the trial courts through the Resentencing Panel will fully conform with such revised standards on their own, without the necessity of appeals, but that if such conformance proves not to

the State's right to appeal admission into PTI programs, we point out that that is a very limited right, which we have expressly given the State in *Rule* 3:28(f), to be used only in those few cases in which the designated judge or assignment judge reverses the prosecutor's denial, concurred in by the PTI director, of admission into the program. See *State v. Garrison,* 232 *N.J.Super.* 443, 446, 557 *A.*2d 680 (App.Div.1989). Also, as we previously discussed, unlike ISP, PTI takes place prior to trial and does not intrude on the Legislature's authority. See *supra* at 562, 608 *A.*2d at 349.

be satisfactory, either this Court or the Legislature could thereafter remedy the situation by appropriate action.

## IX

### *Conclusion*

As noted above, this judgment does not take effect until January 1, 1993; therefore, the action of the ISP Panel vacating defendant's prison sentence and sentencing her to ISP is hereby affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN—7.

*Opposed*—none.